GULF COAST IRRIGATION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MATAGARDA CANAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

TEXAS IRRIGATION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MARKHAM IRRIGATION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 33694, 40081–40083, 41343–41346.   Promulgated November 27, 1931.

*W. E. Barton, Esq., W. E. Davant, Esq.,* and *J. L. Block, C. P. A.,* for the petitioners.

*Harold Allen, Esq.,* for the respondent.

OPINION.

LOVE: The petitioners are claiming the right to deduct the depreciated cost of their pumping plants and 64 per cent of such cost of their canals and laterals ratably over the nine-year period commencing in 1919, on the ground that as of the beginning of the period it was known that either the raft would be removed or a channel cut around it, with the result that the assets would become obsolete to the extent stated. The respondent takes the view that it could not be foreseen until 1927 what effect the lowering of the level of the reservoir above the raft would have on the irrigation system. We think there was no justification for concluding earlier than 1923 that the work would be done.

The raft had been the direct cause of damage to adjacent property, particularly tillable land, at high water for a great many years prior to 1919 and although this was well known in the community, no effort

appears to have been made prior to 1910 to do anything about it. Between 1910 and 1919, the removal of the raft or the cutting of a channel around it was agitated to some unknown extent, but no specific action was taken until 1919. By that time citizens of the two counties above Matagorda County realized that, if the raft continued to increase in length, before many years it would have the direct effect of wholly or partially destroying farm lands adjacent to the river in their counties the same as it had destroyed and was destroying property in Matagorda County. Realization of the necessity of doing something to avoid additional damage to their property prompted a meeting of citizens of the three counties in about 1919 to discuss the subject, with the result that a committee was appointed to petition the State legislature for assistance by exempting the counties from taxation for twenty-five years to pay off a bond issue.

The efforts of the affected citizens to raise funds for the removal of the source of the damage were not confined altogether to the legislature. From 1919 until 1923 they endeavored to have the three counties float bond issues to provide funds for the work. Matagorda County had borrowed up to its legal limit and was unable to raise the money. A fair inference to be drawn from this condition of affairs is that the counties were without financial means to correct the evil and by necessity were forced to look to the legislature alone for aid.

The petitioners produced only one witness to testify on the question of when it became imminent that the raft would be removed or a channel cut around it. The pertinent parts of his testimony on direct examination follow:

Q. Now, I want to ask you when was the earliest time that a reasonable man, knowing the circumstances, could foresee that this raft would be removed either by being dredged out, or a new channel would be cut through to get away from the obstruction it was causing?

A. [LeTulle] You want to know when we could foresee that?

Q. The first time, yes.

A. Just as soon as it was agitated, the people that lived there in 1919 and 1920, as soon as they went to talking about removing it, we knew what effect it would have, for we knew where the river was before, and knew it would go back to it. Does that answer it?

Q. You said 1919 or 1920. I want you to say the first time. You have given two dates.

A. I would say 1919. I will cut out 1918.

Q. What period of 1919 would you say?

A. Well, I will say the first day of 1919 to make it exact.

It is apparent from this testimony that the opinion of the witness was based upon mere agitation for the accomplishment of something rather than a series of happenings which were bound to end in the removal of the raft. That he did not intend to have his testimony

accepted as a positive statement that on January 1, 1919, it was imminent that the raft would either be removed or a channel dug around it, but rather at that time it was foreseeable that something would have to be done to prevent increased damage to property, a separate and distinct thing, is apparent from his testimony on cross-examination. Then, after testifying that he did not say he knew in 1919 what the State legislature would do in 1923, he testified that he did say he " could foresee something had to be done, and the raft had to be removed from the river, or a ditch cut around it to save the whole country there."

The most that can be said of the evidence on this point is that by 1919 more interest was being shown in the removal of the raft than theretofore. Nothing aside from mild agitation occurred prior to 1919, and the sentiment for the project had not progressed to such an extent as to justify a conclusion that the demands of the agitators would be carried out at any time.

The record does not disclose when the citizens of the affected counties filed their petition or what the attitude of the members of the legislature was towards the project when it was presented. The committee conferred with members of the legislature about the matter for " months and months." On June 4, 1923, an act was passed granting the aid sought by the committee. It was not until then that it was imminent that the work would be done which would result in the damage to petitioner's irrigation system.

The respondent contends that of the canals and laterals only the intake canals were affected by the lowering of the pool of water at the head of the raft. There is no evidence of record establishing the abandonment of any part of the canals and laterals, but the testimony is uncontradicted that the amount of water available each year after the removal of the raft was sufficient for only 27,000 acres as against 75,000 acres before that time, a reduction of 64 per cent in the efficiency of the irrigation system. It is now settled beyond question that obsolescence may be allowed for impairment of the efficiency or revenue-producing power of depreciable assets.

In *Niagara Falls Brewing Co.*, 13 B. T. A. 1040, the petitioner's claim for obsolescence of 84 per cent of the depreciated cost of a building and the machinery located therein because of their reduced use from an average of four times a week to once every two weeks was denied on the ground that " a deduction may not be taken for obsolescence where the assets were continued in use in the business." In its reversal of the Board's decision, the Circuit Court of Appeals, 38 Fed. (2d) 217, made a distinction between obsolescence and obsoleteness. It said:

The statute provides for obsolescence, and not for obsoleteness. Obsolescence may and does occur, resulting in an estate more obsolete, when less used or more neglected, without forthwith rendering it entirely obsolete, useless, and fit only to be abandoned.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

If there be obsolescence, without obsoleteness, it is clear that Congress intended to permit the deduction of the amount for obsolescence without abandonment of the assets.

In affirming the Circuit Court's decision the Supreme Court said:

There is no hard and fast rule, as suggested by the Government, that a taxpayer must show that his property will be scrapped or cease to be used or useful for any purpose, before any allowance may be made for obsolescence. 282 U. S. 658.

The parties are in agreement as to the depreciated cost of the assets. The petitioners used a number of pumping plants, but the record does not show the number located on each side of the river. The depreciated cost of such of the pumping plants as are shown under Rule 50 to have been located on the east side of the river should be spread over the period from June, 1923, to the close of 1927, and those on the west side a year longer. Sixty-four per cent of the depreciated cost of the canals and laterals, including the intakes, should be spread over the former period. These allowances are in lieu of such depreciation as has been allowed by the respondent for such periods.

The petitions filed herein raised the issue of whether the petitioners and the Ashby Mill and Warehouse Company were affiliated during all of the taxable years. In the briefs filed on behalf of the parties the issue is limited to the affiliation of petitioners for 1920 and 1921. While counsel for petitioners so stated the issue in one of the opening paragraphs of his brief, his argument and request for relief which followed are confined to the affiliation of the Gulf Coast Irrigation Company and the Markham Irrigation Company. Since so much of the issue raised by the petitions as pertains to the affiliation of the Ashby Mill and Warehouse Company with petitioners was not specifically waived by the petitioners, the original issue, limited to 1920 and 1921, will be regarded as still being before us.

Affiliation is being claimed under 240 (b) of the 1918 Act and 240 (c) of the 1921 Act on the ground that " substantially all " of the stock was owned or controlled by the same interests.

For the period up to February 21, 1921, affiliation is being claimed on the ground that an ownership of 85 per cent of the stock of the Markham Company by the owner of all but a negligible amount of stock of the Gulf Coast Company is within the term " substantially all " as used in the statutes. No contention is made that the

owner of such stock controlled any of the remaining stock of the Markham Company.

During 1920 and 1921, and on and after June 30, 1920, the Markham Company owned all of the capital stock of the Canal Company, the Texas Company, and the Warehouse Company, respectively. While the stock books of the Gulf Coast Company reflect a different ownership, the proof here is that until February 21, 1921, when the stock was sold to LeTulle, Harty actually owned until April 7, 1920, 99 per cent of the corporation's capital stock and 99.5 per cent thereafter. During this period Harty also owned 85.26 per cent of the capital stock of the Markham Company. Of the other stockholders of the Gulf Coast Company only LeTulle held stock in the Markham Company. He owned four shares of stock of the former on and after April 7, 1920, and a qualifying share in the latter. The combined holdings of the two stockholders were never in excess of 85.3 per cent of the outstanding stock of the Markham Company. This percentage of stock ownership is insufficient to meet the statutory requirement of "substantially all." *Peavey-Wilson Lumber Co.* v. *Commissioner*, 51 Fed. (2d) 163. See *Denunzio Fruit Co.* v. *Commissioner*, 49 Fed. (2d) 41; *Burnet* v. *Bank of Italy*, 46 Fed. (2d) 629; *Ice Service Co.* v. *Commissioner*, 30 Fed. (2d) 230; *United States* v. *Cleveland, P. & E. R. R. Co.*, 42 Fed. (2d) 413; *Terre Haute, Indianapolis & Eastern Traction Co.*, 24 B. T. A. 197. In the *Peavey-Wilson Lumber Co.* case, *supra*, a stock ownership of 83.31 per cent in one corporation and 85.51 in another by the holders of 94.65 per cent of the stock of the petitioner was specifically held not to be substantially all.

Affiliation is being claimed for the remainder of 1921 on the ground that LeTulle owned all of the stock of the Gulf Coast Company and owned or controlled all of the stock of the Markham Company. The facts relied upon are (1) the election of LeTulle and Herder on January 31, 1921, as managers of the Markham Company; (2) the provisions of the agreement of February 28, 1921, appointing Herder agent and trustee for the purpose of operating the Markham, Matagarda and Texas Companies; (3) the terms of the agreement of June 7, 1921, as modified November 29, 1921, between LeTulle and the Union National Bank applying the net earnings of the Gulf Coast Company towards outstanding obligations of the Gulf Coast Company, and LeTulle's and Harty's debts to the bank, in the order named, and (4) the agreement of November 29, 1921, between LeTulle and the creditors and stockholders of the Markham Company, wherein LeTulle was given the

management of the corporation for five years, with the right to exercise the voting rights of the stock during the period of his management.

The only material change in stock ownership of the Gulf Coast and Markham Companies in 1921 was the purchase on February 21, by LeTulle, of 990 shares of stock of the former company. On and after February 21 LeTulle instead of Harty owned all but less than one per cent of the stock of the Gulf Coast Company. This mere change of stock ownership within the group of stockholders of both corporations does not alter the situation as regards affiliation on the basis of stock ownership alone. Did LeTulle, then, control a sufficient amount of additional stock to meet the statutory test of "substantially all"?

The appointment of Herder and LeTulle on January 13, 1921, as general managers of the Markham Company, with broad powers of management of the corporation's affairs, is clearly distinguishable from control of stock required by the statute. This was nothing more than a substitution of officers with broader operating authority. Management of a business does not amount to stock control. *Commissioner* v. *Hirsch & Co.*, 30 Fed. (2d) 645.

The agreement of February 28, 1921, appointing Herder agent and trustee to operate the Markham, Matagarda and Texas Companies is of the same general character as the delegation of powers to Herder and LeTulle just referred to. The powers of management did not extend to the Gulf Coast Company and during the period in controversy Herder was not a stockholder of that corporation. Whether the agreement created a trust estate is not raised by either party. We are not referred to any evidence, aside from the instrument itself, giving Herder control over the stock of the corporations for which he was acting. The agreement specifies his powers as agent and trustee without directly or indirectly conveying any stock-voting rights. The terms of the agreement form no basis for holding that they gave Herder actual or legal control over stock held by any other stockholder.

Neither did the provisions of the agreement LeTulle entered into on June 7, 1921, with the Union National Bank give him control over any stock. Of Harty's stock of the Markham Company, 2,000 shares were then in the hands of the bank as security for a loan, and, so far as the record shows, the remainder of about 900 shares was in his possession, with all the rights that go with stock ownership. Other stockholders of the Markham Company were not affected, directly or indirectly, by the agreement until November 29, 1921, when it was modified so as to provide for the application of earnings of the Gulf Coast Company to the payment of liabilities of the Markham Company. If we were to assume that the agreement

had the effect of giving LeTulle control over all of Harty's stock, the percentage of stock ownership and control in the hands of LeTulle would not exceed 85.3, which, as pointed out above, is not enough to satisfy the statute.

On and after November 29, 1921, the situation as respects control was materially different. By that time the financial affairs of the Markham Company had reached a point where only drastic action would save the corporation from going into the hands of a receiver. LeTulle prevented such a proceeding by guaranteeing the liquidation of the corporation's debts within five years. In return for this valuable consideration, all of the other stockholders agreed with LeTulle and the corporation's creditors to give LeTulle full and complete control over the activities of the corporation and to vote their stock under his direction. LeTulle promptly exercised the voting rights given him by causing the resignation of objectionable directors, including Harty, the principal stockholder, and the election of others to fill their places on the board. The voting rights given LeTulle, based, as they were, upon a valuable consideration, were not mere proxies, but legally enforceable obligations for a period of five years. This binding agreement gave LeTulle control over such of the stock of the Markham Company as he did not own. See *S. N. & C. Russell Manufacturing Co.*, 16 B. T. A. 501 and *J. A. Folger & Co.*, 23 B. T. A. 210. On and after November 29, 1921, LeTulle owned 99.4 per cent of the stock of the Gulf Coast Company and owned or controlled all of the stock of the Markham Company, which, as hereinbefore stated, owned all of the stock of the other three corporations. Accordingly, we hold that on and after November 29, 1921, the petitioners and the Ashby Mill and Warehouse Company were affiliated.

*Decision will be entered under Rule 50.*