JOSEPH E. SWANSON, JAMES OTIS, EDWARD M. WILLOUGHBY, JOHN H. HARDIN, AND THURSTON B. SWANSON, AS TRUSTEES OF THE FULLERTON PARKWAY LAND TRUST, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 32571, 41308. Promulgated February 16, 1934.

*Arnold R. Baar, Esq.*, for the petitioners.
*E. A. Tonjes, Esq.*, for the respondent.

1124

· OPINION.

McMahon: The first question to be determined is whether the Fullerton Parkway Land Trust is a trust or an association taxable as a corporation within the meaning of section 2 (a)(2) of the Revenue Act of 1926, which is as follows:

Sec. 2. (a) When used in this Act—

\* \* \* \* \* \* \*

(2) The term "corporation" includes associations, joint stock companies, and insurance companies.

In *Trust No. 5833, Security-First Natl. Bank* v. *Welch*, 50 Fed. (2d) 613; affd., 54 Fed. (2d) 323; certiorari denied, 286 U.S. 544, it appears that a real estate operator in association with other persons undertook to acquire a tract of some 90 acres of land to improve the same by laying out streets, etc., and to subdivide the tract into city lots and sell them to the public at a substantial profit. The District Court, in its opinion, after setting forth certain provisions of the declaration of trust under which the project was launched, states:

\* \* \* It is true that the trust in many respects was self-executing, and to some extent was an escrow and security device. It was, however, also a functioning, operating business carried on for profit by the joint action of the trustee, beneficiaries, and sales agents.

\* \* \* \* \* \* \*

\* \* \* It seems to me that to classify this trust as a mere liquidating trust such as those encountered in the administration of estates of deceased persons or in financially embarrassed businesses or projects would be an unreasonable classification. \* \* \*

To the same effect see *Commissioner* v. *Atherton*, 50 Fed. (2d) 740, affirming *C. H. Atherton et al., Trustees*, 19 B.T.A. 1172. See also discussion and cases cited in *Monrovia Oil Co.*, 28 B.T.A. 335, and in *Ittleson* v. *Anderson*, 2 Fed. Supp. 716; affd., 67 Fed. (2d) 323.

To the effect that the nature of the activities of the entity probably constitutes the best test, see *Tyson* v. *Commissioner*, 54 Fed. (2d) 29 (C.C.A., 7th Cir.); *Fisk* v. *United States*, 60 Fed. (2d) 665; *Sloan* v. *Commissioner*, 63 Fed. (2d) 666 (both (C.C.A., 9th Cir.);

*Dunbar* v. *Commissioner*, 65 Fed. (2d) 447 (C.C.A., 1st Cir.), and cases cited in them.

The petitioners contend that all the characteristic forms and modes of procedure of a corporation are lacking in the instant proceeding; but, in this respect, the trust agreement provides that the trustees shall have exclusive management and control of the real estate described therein and of any buildings or improvements thereon; that the trustees shall have certain enumerated powers, including the right to hire suitable offices for the transaction of the business of the trust and to employ agents, servants, and attorneys at law, either from among their own number or otherwise; that neither trustees nor any beneficiary shall be personally liable and all persons dealing with the trustees shall look only to the property of the trust; that the interest of the beneficiaries shall be evidenced by receipts issued by the trustees, which receipts shall be construed to be personal property and shall not be held to be an interest in or evidence of an interest in real estate; that the beneficial interests shall be represented by 3,000 shares of the par value of $100 each, aggregating $300,000; that such shares may be transferred in the manner provided in the trust agreement; that upon resignation of a trustee or trustees such vacancies shall be filled by the remaining trustees or trustee, if there be only one; that the trustees may delegate their powers for a period not exceeding one year at any one time to any other trustee or to other trustees; that the trust agreement may be amended by an agreement in writing by the beneficiaries holding three fourths or more in value of the receipts, which amendment or amendments shall be binding upon the beneficiaries and trustees; that the trust shall be terminated at the expiration of 20 years after the death of the last survivor of named children of Ralph C. Otis, Joseph E. Swanson, and Thurston B. Swanson or by the trustees in their discretion at any time before the expiration of the 20 years by selling all the property held by them as such and distributing the net proceeds of such sale.

In the instant proceeding the organization had succession and the death of a beneficiary or a trustee did not interfere with or terminate the existence of the association; while it had no corporate name, the trust so-called could be sued and could sue in the name of the trustees; it could acquire and hold property and do other acts in the name of the trustees; it had no common seal, but this is not an indispensable requirement; it did not have bylaws, but bylaws are not an essential requisite to corporate existence. They are rules for internal government and if the agreement or charter is deemed sufficient for that purpose, bylaws are superfluous.

Fletcher Cyclopedia Corporations, vol. 2, sec. 10, p. 14, and sec. 5, p. 5, and cases cited.

In *Sears, Roebuck & Co., etc., Fund* v. *Commissioner*, 45 Fed. (2d) 506, the court held that a practical semblance to corporate forms and methods was sufficient. To the effect that a quasi-corporate form or organization is not a controlling factor or indispensable element of an "association", see *Twin Bell Oil Syndicate*, 26 B.T.A. 172; *Investment Trust of Mutual Investment Co.*, 27 B.T.A. 1322. See discussion in the latter case at page 1330.

The petitioners argue that the trustees were not subject to the control of the beneficiaries. Control by the beneficiaries is not a determinative factor. *Ittleson* v. *Anderson, infra.* Furthermore, this lack of control in the instant proceeding is largely theoretical, as the beneficiaries and the trustees were the same until 1920, in which year Joseph E. Swanson transferred his shares to his wife, and Ralph E. Otis transferred his shares to the Central Trust Co. as trustee for himself. In 1919 or 1920 Hibbard died and thereafter the partner of Swanson became trustee. Ralph E. Otis was later succeeded by his son as trustee. The association enjoyed benefits similar to those of corporate existence. The beneficiaries in the trust agreement provided that the trustees could delegate their powers to a trustee. It seems that at the very outset the group relied and has continued to rely upon the business acumen and ability of Joseph E. Swanson; that under the agreement they could and did permit him or his firm under his direction to manage and operate the enterprise. The agreement gave the beneficiaries the sole right to amend the agreement and had they desired to do so they could have curtailed the powers of the trustees by amending the agreement.

The petitioners further argue that the trust was not engaged in business and that it was not formed for the purpose of carrying on any business. It certainly was not organized for the purpose merely of preserving or of settling, liquidating, and winding up the affairs of an estate or business. It was doing more than acting as a passive holder of property or a conduit to carry over profits to persons entitled to them. *Ittleson* v. *Anderson, supra.* Cf. *Commissioner* v. *Morriss Realty Co. Trust No. 2*, 68 Fed. (2d) 648, affirming *Morriss Realty Co. Trust No. 2*, 23 B.T.A. 1076.

In *J. W. Pritchett et al., Trustees*, 17 B.T.A. 1056, 1064, 1071, the Board held that the owning and renting of one apartment home or an apartment hotel constitutes the carrying on of a business for profit. There is but one property involved in the instant proceedings.

*Tyson* v. *Commissioner, supra,* cited by the petitioners, is distinguishable. The court held that, for income tax purposes for the

years in question, the Zenith Real Estate Trust was a trust and not an association, based primarily upon testimony of witnesses, from which the court concluded that " the investment was one which provided with reasonable certainty for a sure and fixed income without either care or supervision."

The facts as disclosed by that testimony are similar to the facts in *Lansdowne Realty Trust* v. *Commissioner*, 50 Fed. (2d) 156, cited by the petitioners.

The doctrine enunciated by the court in *Tyson* v. *Commissioner*, 54 Fed. (2d) 29, *supra*, was applied by the same court in *Tyson* v. *Commissioner*, 68 Fed. (2d) 584.

The difference in activity required to take care of a property covered by a long term lease and that required to take care of a property with 16 apartments, which apartments were originally leased for a term of from three to five years and thereafter renewed for a term of one year, is considerable. Joseph E. Swanson testified that after the erection of the modern buildings the better tenants moved. In fact it is argued on brief in support of the second issue involved herein that the testimony was very definite to the effect that during the taxable years, and prior thereto, it was becoming increasingly difficult to rent the apartments. However, it appears that the total rental during 1920 and 1921 amounted to $65,000 and increased gradually until from 1926 to 1929 the total rentals were about $82,000 to $84,000, and that there were no vacancies during 1924, 1925, and 1926. Despite the alleged difficulty in renting the apartments, the total rentals increased substantially. It may be said in reference to the situation present here, as stated by the court in *Sears, Roebuck & Co., etc., Fund* v. *Commissioner*, *supra*, that a " study of all the purposes of the plan discloses that its objects have been and can only be gained through the use of much skill, ability, and sound business judgment."

Numerous cases decided by the courts and the Board bearing on the first issue presented in these proceedings are cited and discussed on briefs by the parties. While prior decisions enunciate general principles and illustrate the application thereof to the facts presented in each case, it is apparent that each case must be determined upon its own peculiar facts. Therefore, we do not believe that a discussion of all these cases would serve a useful purpose.

Upon the authority of the foregoing cases which we have discussed or cited, we conclude that the Fullerton Parkway Land Trust is an association within the meaning of section 2 (a) (2) of the Revenue Act of 1926.

The petitioners further contend that, if the Fullerton Parkway Land Trust is subject to tax as an " association ", the deduction

allowed by the respondent for depreciation, including obsolescence, should be increased to from 6 to 8 percent of the stipulated basic sum of $271,668.93. It is claimed that due to building activities in the section in which the property involved is located the value of the realty, which was purchased in 1916 for about $62,000, increased to more than $400,000 in 1925; that the increased land value resulted in increased taxes; and that the return from the building became wholly disproportionate to the capital value of the property.

Joseph E. Swanson testified that the building of the modern 16 to 20-story apartment buildings and hotel buildings changed the Fullerton Parkway Land Trust Building into a second-class building; that people coming to the neighborhood in search of an apartment preferred the newer and more modern buildings; that they naturally had to reduce the rents to meet the competition of the more pretentious buildings; that in 1925 and prior thereto the better tenants left to go to these more modern buildings. However, he also testified that there were no vacancies in the buildings during 1924, 1925, and 1926; that the total yearly rentals increased from $65,000 in 1920 and 1921 to about $82,000 to $84,000 in 1926, and continued at about $84,000 until after 1929, when rentals fell off considerably, which condition, however, prevailed generally with respect to all buildings. It appears, therefore, that while the building activities resulted in increased land values and increased taxes, and while greater difficulty in obtaining tenants may have been encountered, such building activities also resulted in increased rentals to the petitioners. *Anna J. Cotton*, 25 B.T.A. 1158, affd., 68 Fed. (2d) 436, on another issue, by the Circuit Court of Appeals of the District of Columbia, wherein no question was raised as to the Board's holding as to obsolescence.

In *U.S. Cartridge Co.* v. *United States*, 284 U.S. 511, 516, the United States Supreme Court defines " obsolescence " as follows:

* * * Obsolescence may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws and other things which, apart from physical deterioration, *operate to cause plant elements or the plant as a whole to suffer diminution in* value. *Burnet* v. *Niagara Brewing Co.*, 282 U.S. 648, 654; *Gambrinus Brewery Co.* v. *Anderson*, 282 U.S. 638. [Emphasis supplied.]

There is no evidence showing that the building decreased in value. The character of the section wherein this property was located did not change. It remained residential in character. In fact, the erection of the modern apartment buildings and hotels increased its desirability for residential purposes. In the instant proceeding, as in the *Cotton* case, *supra*, the rentals increased after the erection of the modern buildings, and in the instant proceeding the rentals continued to increase until after 1929, when rentals decreased in general.

Swanson testified as follows:

Q. Well, the question of whether the building could be profitably operated for any length of time, that is purely your opinion, isn't it?

A. The building could not be profitably operated for any length of time, knowing the expenses of this building, it can not be operated on such a valuation with the taxes there, because now it is running at a loss.

He also testified in substance that the rate of return, based on cost, without taking into consideration any enhancement of land values, was better in 1926 than in 1920; and that, based on the increased land values, without taking into consideration the cost, the rate of return on the property was not as good in 1926 as in 1920. However, a decrease in the rate of return does not in itself establish obsolescence.

The action of the respondent with respect to computation of the allowance for depreciation including obsolescence is therefore approved.

Reviewed by the Board.

*Decision will be entered for the respondent.*