JAMES D. DUNN AND JO ANN DUNN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1315-62.    Filed June 8, 1964.

*Harvey D. Trimble,* for the petitioners.
*Helen A. Viney* and *Theodore W. Hirsh,* for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in the income tax of petitioners for the years 1958 and 1959 in the respective amounts of $3,852.37 and $4,332.08. The only issue for decision is whether the petitioners are entitled to depreciation deductions on certain special-purpose grain-storage warehouses in excess of those determined by respondent because of claimed anticipated economic obsolescence.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

James D. Dunn and Jo Ann Dunn are husband and wife, who resided during the years 1958 and 1959 in the village of Ohio, Ill. They filed their joint Federal income tax returns for the taxable years 1958 and 1959 with the district director of internal revenue at Chicago. They computed their income on the cash receipts and disbursements method.

During these years James D. Dunn (hereinafter called petitioner) was in the business of buying and selling grain and of renting grain-storage facilities in the village of Ohio, Ill., which has a population of 500 and is located about 100 miles west of Chicago and 20 miles away from any community with a population of 10,000.

During the years 1955 through 1961 petitioner constructed facilities for the purpose of storing corn. These facilities are special-purpose buildings known as Butler Grain Storage Buildings. They were built to conform to Government specifications for the storage of Government-owned grain.

The following schedule shows the capacity of grain-storage facilities constructed by petitioner during the years 1955 through 1961:

| Year: | Capacity in bushels |
|---|---|
| 1955 | 64,000 |
| 1956 | 74,000 |
| 1957 | 140,000 |
| 1958 | 140,000 |
| 1959 | 81,000 |
| 1960 | 156,000 |
| 1961 | 156,000 |

The year of acquisition and the cost of the three grain-storage facilities here involved are as follows:

| Year of acquisition: | Cost |
|---|---|
| 1957 | $33,819 |
| 1958 | 34,400 |
| 1959 | 23,269 |

The buildings were made of steel, assembled on the site, and erected upon a concrete foundation. Two of them are 200 feet long, 50 feet wide, and with 14-foot sidewalls; one is 120 feet long, 50 feet wide,

and with 14-foot sidewalls. They differ from ordinary steel warehouse buildings in the following particulars: (1) They are much stronger and tighter; (2) they are erected on a specially reinforced floor; (3) the metal used is a high-tensile-type steel instead of "mild steel"; and (4) there are more girders, columns, cross braces, and bolts.

Before the buildings can be used for the storage of Government-owned grain they must be inspected by a representative of the Department of Agriculture. In order to secure approval for such storage it was necessary to have the buildings wired for electricity with heavy wire connected to an installation of ventilating tunnels and fans which draw air through the corn to prevent spoilage.

The grain-storage facilities built in the years 1958 and 1959 were constructed on land owned by the petitioner. The grain-storage facility constructed in 1957 was erected upon land owned by the Chicago, Burlington & Quincy Railroad Co. in Ohio, Ill. Petitioner leased the land from the railroad. The lease has no specified term, but can be terminated by the railroad upon 30 days' notice. All of petitioner's grain-storage facilities are adjacent to railroad rights-of-way.

During the years 1958 and 1959, as well as for many years prior thereto, the U.S. Government acquired grain under various governmental programs then in operation. Under these programs it became necessary for the Government to lease private facilities for the storage of grain. Petitioner's buildings were constructed for the purpose of storing Government-owned corn. Their construction was financed in part by real estate loans from the Citizens First National Bank of Princeton, Ill., maturing in 4 or 5 years.

Throughout the years 1958 and 1959 and for prior and subsequent years, the U.S. Government has implemented various programs whereby production of grain within this country could be reduced.

In January 1964, the petitioner had approximately 350,000 bushels of grain in storage and had total storage facilities for 821,000 bushels.

The buildings have no salvage value because the cost of dismantling would exceed the value of the dismantled parts.

Petitioner has been unable to find any alternative or substitute use for the buildings.

Depreciation was claimed by petitioner on the buildings as follows:

| Year of acquisition | Cost | Amount claimed | | Method |
|---|---|---|---|---|
| | | 1958 | 1959 | |
| 1957 | $33,819 | $6,600 | $6,600 | SL—5 years. |
| 1958 | 34,400 | 6,880 | 5,504 | DDB—10 years. |
| 1959 | 23,269 | | 2,327 | DDB—10 years. |
| | | 13,480 | 14,431 | |

In his notice of deficiency dated January 25, 1962, respondent determined that depreciation on the buildings was allowable as follows:

| Year of acquisition | Depreciation allowed | |
|---|---|---|
| | 1958 | 1959 |
| 1957 | $1,576.26 | $1,576.26 |
| 1958 | 3,440.00 | 3,096.00 |
| 1959 | | 1,163.46 |

The useful life of these grain-storage buildings is at least 20 years.

### OPINION

Section 167(a), Internal Revenue Code of 1954,[1] provides for an allowance for the exhaustion, wear, and tear, including a reasonable allowance for obsolescence, of property used in a trade or business. Provisions of the Income Tax Regulations are likewise pertinent to our consideration of the issue presented in this case.[2]

Respondent has determined that deductions for depreciation claimed by petitioner with respect to the grain-storage buildings constructed by petitioner during the years 1957, 1958, and 1959 are excessive and in his notice of deficiency has set forth allowable depreciation based

---

[1] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

[2] Sec. 1.167(a)-1 Depreciation in general.

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. * * *

Sec. 167(a)-9 Obsolescence.

The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete. * * *

on a 20-year useful life. Of course, respondent's determinations as to the amounts of depreciation allowable for the taxable years 1958 and 1959 are presumptively correct and the burden rests upon the petitioner to prove they are erroneous. *M. Pauline Casey*, 38 T.C. 357, 381 (1962); Rule 32, Tax Court Rules of Practice.

Petitioner contends that the rates of depreciation he used are entirely justified when viewed in the light of the "reasonably foreseeable useful life of the respective storage facilities." The essence of this contention is that when the grain-storage facilities were constructed the farm surplus situation in the United States was such that the establishment of a short depreciable life for these buildings was necessary. The theory behind this argument is that the facilities were such as to be economically obsolete at the end of the proposed depreciable lives chosen by the petitioner.

To the contrary, respondent asserts that if the petitioner's position is correct he must show with reasonable certainty (1) that the property is becoming obsolete, and (2) that the property will be obsolete; that is, petitioner must show what is the normal life of the assets and that the assets will be obsolete before the end of that normal life. *Detroit & Windsor Ferry Co.* v. *Woodworth*, 115 F. 2d 595 (C.A. 6, 1940). We agree that this showing is necessary in view of the antithetical natures of the depreciation allowance and the obsolescence allowance. Depreciation is a deduction based on an allowance for use of an asset, whereas obsolescence is such as allowance based upon disuse. *Renziehausen* v. *Commissioner*, 280 U.S. 387 (1930). Mere reductions of earnings or profits, or even the entire absence of profits, have not been sufficient bases for a deduction for obsolescence. *Detroit & Windsor Ferry Co., supra*, and *Richmond Belt Railway Co.*, 13 B.T.A. 1291 (1928). Declining values due to economic conditions will not support a claim for obsolescence. *United Business Corp. of America*, 19 B.T.A. 809 (1930), aff'd. 62 F. 2d 754 (C.A. 2, 1933), certiorari denied 290 U.S. 635 (1933); *State Line & Sullivan R. Co.* v. *Phillips*, 98 F. 2d 651 (C.A. 3, 1938), certiorari denied 305 U.S. 635 (1938). Overexpansion or other similar management decisions will not support a claim for obsolescence. *Real Estate Title Co.* v. *United States*, 309 U.S. 13 (1940).

Petitioner also argues that his entire business was dependent upon governmental policies relating to agricultural production and was therefore uncertain in its future. We find it unnecessary to discuss the various factors pertaining to governmental policies respecting agricultural production during the years in question or for prior or subsequent periods. Suffice it to say that there have been continual changes in our national agricultural programs and, primarily because of technological developments, farm production has continued to increase and the same problem of overproduction remains. Agitation

for a solution to the farm-surplus problem, in the absence of actual reasonable foreseeability of such a solution which would affect the petitioner's business in a manner requiring abandonment of his grain-storage facilities, is insufficient to support a claim for anticipated obsolescence. Cf. *Gulf Coast Irrigation Co.*, 24 B.T.A. 958 (1931).

Moreover, petitioner's claim for anticipated economic obsolescence conflicts with his actions and activities. Instead of disclosing obsolescence, the evidence establishes continued and consistent use of the facilities, even up to the date of the trial of this case. The petitioner has never decided that he would stop using the buildings at any time in the foreseeable future. He embarked on an extensive program of constructing grain-storage facilities in 1955 [3] and it continued through 1961. At the date of the trial, January 8, 1964, the petitioner had 350,000 bushels in storage in these facilities. To permit an allowance for obsolescence while the property is being continuously used for its original purpose, while the petitioner continues to build new facilities and while no intention to discontinue such use appears, is to make an allowance in the face of conditions which are the very opposite of obsolescence. *Detroit & Windsor Ferry Co.*, supra, and *Radio Station WBIR, Inc.*, 31 T.C. 803, 817 (1959). What this record discloses is that the excess capacity of the facilities results from petitioner's own voluntary action in overexpansion. And this is not a basis for claiming obsolescence. *Real Estate Title Co.* v. *United States*, supra. Indefinite expectations and suppositions are not enough to support a claim for obsolescence. See *Southeastern Building Corporation*, 3 T.C. 381 (1944), affd. 148 F. 2d 879 (C.A. 5, 1945), certiorari denied 326 U.S. 740 (1945). In that case we said (pp. 389–390):

Such a definition of obsolescence is consistent * * * with the idea expressed in the *Real Estate-Land Title & Trust Co.* case where the Court speaks of "economic conditions, whose effect on physical property is recognized as obsolescence," and "which similarly cause or contribute to the relentless march of physical property to the junk pile." Thus, in a case where there is no abandonment of the property, actual or contemplated, the taxpayer will be allowed a deduction for obsolescence if he sustains the burden of proving that normal deductions for depreciation based upon the original estimated life of the property will be insufficient to restore to him the basis of his property, because the original estimated life of the property has been cut short as a result of the property's having been rendered inutile for the function it performed prior to the event which caused the alleged diminution of value.

* * * There is no evidence that this building was abandoned by petitioner or that it contemplated its abandonment after December 31, 1943. There being no evidence that the useful life of this building as an ordinary warehouse was any shorter than its useful life as a special purpose warehouse, it can not be

---

[3] Petitioner constructed two facilities in 1955 and 1956 which were subject to the provisions of sec. 169 allowing for amortization over a 60-month period. These facilities are not in issue here. Sec. 169 is not applicable to grain-storage facilities constructed after Dec. 31, 1956. Depreciation of such facilities is governed by sec. 167.

said that petitioner will be precluded from realizing the restoration of any basis it has by virtue of its annual deductions for depreciation based upon the original estimated life of the building. The decrease in the rate of return and concomitant decline in value of the property due to inability to find a tenant whose business requires the special characteristics of this warehouse do not, under the facts in this case, entitle petitioner to a deduction for obsolescence.

Accordingly, we hold that this petitioner has failed to prove that the grain-storage facilities here in issue are depreciable at a rate in excess of that determined by respondent. See *Radio Station WBIR, Inc., supra; Southeastern Building Corporation, supra;* and *Consolidated Freight Lines, Inc.,* 37 B.T.A. 576 (1938), affd. 101 F. 2d 813 (C.A. 9, 1939), certiorari denied 308 U.S. 562 (1939).

*Decision will be entered for the respondent.*