Colin M. and Carol Peters v. Commissioner.
Peters v. Commissioner
Docket No. 5361-66.
United States Tax Court
T.C. Memo 1969-52; 1969 Tax Ct. Memo LEXIS 243; 28 T.C.M. (CCH) 294; T.C.M. (RIA) 69052; March 17, 1969, Filed *243 Petitioners owned certain property upon which they constructed office buildings in 1961 and 1962, which were held for the production of income. The property was located in an area used for residences and office facilities of companies engaged in electronics research and development. The needs of that industry in terms of buildings were in a constant state of flux. Respondent determined the useful lives of the buildings for depreciation purposes, disallowing a portion of the depreciation deductions claimed for 1962 and 1963. Held: Respondent's determinations of useful lives of the respective buildings sustained. Petitioners have not met their burden of proof to show error therein. Donald G. Daiker, for the petitioners. Joseph Nadel, *244 for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in the petitioners' income taxes for the years 1962 and 1963 in the respective sums of $5,831.86 and $10,241.80. After concessions and adjustments agreed to by the parties, [1] the sole issue remaining for decision is as to the depreciation deductions determined by the useful lives of two buildings and their component parts, erected by petitioners in 1961 and 1962 and held for the production of income in the years before us. Findings of Fact Those facts which were stipulated are found accordingly and are incorporated herein by this reference, together with the stipulated exhibits. Colin M. Peters and Carol Peters are husband and wife, and resided in Los Altos Hills, California, at the time the petition was filed herein. They filed their joint Federal income tax returns for the years 1962 and 1963 with the district *245 director of internal revenue at San Francisco. Carol Peters is a party herein only because she filed joint income tax returns with her husband, Colin Peters. The latter will hereinafter be referred to as petitioner. Petitioner is a practicing lawyer and a member of a law firm with offices in Palo Alto, California. In 1961 and 1962, he constructed two commercial buildings on property owned by him on East Meadow Circle in Palo Alto. The shell of the first building at #1069 was put up late in the fall of 1961, the date acquired being stipulated as "11/61" and the cost thereof as $89,335.89. The rest of that building was "acquired" in June 1962 at a cost of over $225,000. The second building was acquired in September 1962 at a cost in excess of $114,000; it is located at 1033 East Meadow Circle. (One lease in evidence states that the address is 1035 East Meadow Circle.) The two buildings were erected, using "tilt-up" construction. A cement pad was poured which eventually served as the floor. The walls were framed lying flat and after the concrete was poured the walls were then lifted to a vertical position. Next, beams were inserted to support the walls, and vertical cement columns were *246 poured to support the beams and roof. The final product resembled a box, and the tilt-up process was considered an inexpensive method of construction for the area. The buildings were located in an area known as the "mid-peninsula" area. It includes Palo Alto, Mountain View, Sunnyvale, and Stanford University. The area, under the influence of the University, has become a national center for the electronics industry. Businessmen in that industry find the mid-peninsula area desirable because trained employees are readily available. An engineer with a college degree can work at one of the plants, and simultaneously advance his education at the University. Further, the "Palo Alto" mailing address lends prestige to a company in the electronics industry because of its recently acquired national prominence. In the past few years almost all of the available land within a 2-mile radius of the University has been taken for use similar to petitioner's. Thus the amount of avail- 295 able property close to the University suitable for electronics research and development has been diminishing quickly. Petitioner's two buildings take up one and three-quarters acres of East Meadow Circle; the *247 remainder of the 10-acre circle had not been improved at time of trial. Most of the buildings in the circle area are one-story buildings of tilt-up construction similar to petitioner's. Several blocks away, however, in 1967 Philco constructed a 5-story building. Philco is also building a 130-foot high testing tower for satellite components on adjacent land. Present zoning on East Meadow Circle would prohibit a building as tall as Philco's; however, it might be possible to apply for and receive a variance for multi-story construction when the usage fits the overall area. However, at time of trial most of the immediately adjacent areas were residential. One of petitioner's two buildings, known as the "Air Force Building," is leased to the Philco Company. The other building, known as the "Utah Building," is leased to the Utah Construction Company and the United States Post Office. The dates of acquisition and original cost of the Air Force Building were as follows: Component Part
Date Acquired
Cost
Building - Shell
11/61
$ 89,335.89
[1] H.V.A.C. 6/62
51,191.44
Plumbing
6/62
11,074.59
Electrical
6/62
47,576.44
Asphalt Tile
6/62
6,446.61
Paving
6/62
9,283.22
Venetian Blinds
6/62
1,978.76
Drapes, carpeting
6/62
2,699.48
Addition to Shell
6/62
33,085.78
Special for Air Force
6/62
5,775.31
Interior partitioning
6/62
69,530.58
Misc.
6/62 2,335.94
TOTAL
$330,314.04
*248 The date of acquisition and original cost of the Utah Building were as follows: Component Part
Date Acquired
Cost
Building
9/62
$ 89,939.67
[1] H.V.A.C. 9/62
8,304.00
Electrical
9/62
9,665.00
Paving
9/62 6,420.00
TOTAL
$114,328.67
The buildings in the area are used as research and development centers and laboratories. The projects upon which research of the tenants dwells are generally short-term but the needs are frequently varied. After the shell of a building is erected in this area the electrical, heating, air conditioning, plumbing and other components are installed as are the interior partitions and other features to suit the tenant or prospective occupant. The electrical and plumbing facilities must be modified constantly to meet the needs of the tenants depending upon the particular research project in progress. However, petitioner's tenants were responsible for the costs of such changes under their leases. The changing uses to which the lessee puts the building were the major reason for using title-up construction when the buildings *249 were built. While tilt-up construction of 1-story buildings was in demand by the industries which used the Palo Alto area, and particularly Philco Industrial Park, when petitioner's buildings were constructed, such might not be the land's best use in the future. The growth-minded nature of the local industry could demand a multistoried or different sort of building in the future. Thus while petitioner is receiving the best rate of return on his property now, the changing electronics industry and demand for more space in the immediate area might force him to demolish his present buildings and construct different ones at some time in the future in order to continue receiving the best possible rate of return on his investment. Such destruction could become necessary before expiration of the buildings' physical lives, but it was not reasonably foreseeable in 1962 and 1963. Additional unimproved land was avilable not only near petitioner's buildings, but in the Stanford Industrial Park near the University in the years before us as well as five years later at time of trial. Land usages in the Palo Alto area, which are presently considered normal, would have been considered fantastic in *250 the late 1950's, and in fact even when petitioner's buildings were built. The 5-story Philco office building in the Philco Industrial Park is representative of the changing nature of land usages. At time of trial raw land was becoming scarce, with land values rising as a result; however, as already indicated there was some available nearby and a large portion of petitioner's adjacent land was still unimproved. Vertical multistoried construction similar to the Philco Office Building may become necessary to achieve the maximum rate of return on an investment in the area at some future time. Thus the economic feasibility of more expensive usages is becoming possible as the Palo Alto area continues to grow. However, at time of trial no buildings in the area were being demolished to permit construction of multistoried replacements. 296 In 1962 and 1963, the years before us, petitioner's buildings were brand new, having just been completed. They were occupied immediately by tenants as research, development, administrative and office facilities, the purposes for which they were built, and in fact the Utah Building was leased for ten years with a 5-year renewal option even before it *251 was completed. Both buildings have been continuously used and occupied since 1962 for the purposes for which they were constructed. Neither building was economically obsolete in 1962 and 1963, nor was there even a hint or possibility considered that they would be abandoned or demolished at any time in the foreseeable future. In 1962 and 1963, petitioner reported the following gross rentals and claimed the following depreciation deductions: Building
Year
Gross Rent
Depreciation
Air Force
1962
$33,403.88
$19,120.74
Air Force
1963
97,080.00
29,667.71
Utah
1962
4,240.52
3,025.62
Utah
1963
9,582.46
8,798.14 A net loss from rental income was claimed for both buildings in 1962, in the respective amounts of $5,865.12 and $937.81 and in 1963, a net rental loss of $7,306.65 was claimed for the Utah Building. These losses were used to offset petitioner's other reported income in substantial amounts each year. The useful life determined by respondent and the useful life used by petitioner in depreciating the Air Force Building and its component parts in the years in issue are as follows: Useful Life Determined By Respondent
Useful Life Used By Petitioner For Depreciation Purposes
Buildings hell
45 years
30 years
H.V.A.C.
45 years
12 years
Plumbing
45 years
20 years
Electrical
45 years
20 years
Asphalt tile
45 years
10 years
Paving
20 years
10 years
Venetian blinds
5 years
5 years
Draperies, carpeting
5 years
3 years
Additions to shell
45 years
30 years
Special for the Air Force
5 years
Interior partitioning
45 years
Misc.
45 years
*252 The useful life determined by respondent and the useful life used by petitioner in depreciating the Utah Building and its component parts in the years in issue are as follows: Useful Life Determined By Respondent Useful Life Used By Petitioner For Depreciation Purposes Building 45 years 30 years
H.V.A.C. 45 years 20 years
Electrical 45 years 20 years
Paving 20 years 10 years Opinion Section 167(a), I.R.C. 1954, [2] permits a depreciation deduction for property used in a trade or business or held for the production of income. The deduction includes a reasonable allowance for obsolescence as well as exhaustion, wear and tear. The Commissioner's Regulations [3] expound in 297 detail upon the methods used to determine the useful life necessary for computation of the depreciation deduction, and guidelines to determine useful lives are laid down by Rev. Proc. 62-21, 1962-2 C.B. 418, which includes composite depreciable lives for office buildings and their supporting equipment. *253 Respondent has determined that the deductions for depreciation claimed by petitioner with respect to the Air Force Building and the Utah Building in 1962 and 1963 were excessive. In his notice of deficiency, respondent set forth allowable depreciation for the component parts of the buildings based primarily upon physical life, but with an allowance for obsolescence included. He increased the useful lives as set forth in our findings. At trial respondent and his expert witness conceded that his determination was based on a composite life of 45 years for the building shells and their component equipment parts for plumbing, heating, electrical work, et cetera. Such determinations are presumptively correct and the burden rests upon petitioner to justify employment of shorter useful lives for computing depreciation of his income-producing buildings. M. Pauline Casey, 38 T.C. 357, 381 (1962), acq. 1963-2 C.B. 4. We noted in Casey the Supreme Court's comment that the useful life of an asset is "the number of years the asset is expected to function profitably in use. *254 " See Massey Motors, Inc. v. United States, 364 U.S. 92 (1960). Petitioner contends here that the short useful lives he used are justified in light of the rapidly changing economic conditions in the Palo Alto area and the demands of the electronics research and development industry. He offered no evidence as to shorter physical lives than respondent determined either as to the components or on a composite basis. He urges that petitioners made an honest and fair estimate of the length of time the components would be held for rental and that as a result of economic obsolescence the components have a shorter useful life than their physical life. Although the buildings may function in
Business Use of Residence 4,588.81 4,588.81 0. petitioner believes that they will not function profitably in use for that long. He therefore employed useful lives equal only to the number of years during which he estimated he could expect to draw a maximum profit from the buildings. After that time has passed, petitioner avers that he will seek a more profitable use for his property by replacing the present buildings with structures more suited to the needs of Palo Alto lessees at that time. *255 Petitioner urges that since the area is in the midst of rapid industrial development, the present buildings will become obsolete in a shorter period of time than either the physical lives or the useful lives assigned to them by respondent. However, in 1962 and 1963, which was almost the same time at which the buildings were erected, he had no plans to demolish the buildings in the future or at any foreseeable time. Petitioner's contention that he will replace his buildings with more profitable structures when economic conditions of the area so demand appears possible because of future economic obsolescence. Section 1.167(a)-1 (b), Income Tax Regs., indicates the Commissioner's willingness to allow a useful life equal to the period over which the asset will be useful to the taxpayer in the production of income. Section 1.167(a)-9 explains that the Commissioner's position permits a useful life shorter than the physical life of the asset when reasonably foreseeable economic changes will render the asset economically obsolete regardless of its physical condition. *256 We have held, however, that "indefinite expectations and suppositions are not enough to support a claim for obsolescence." Stevens Pass, Inc., 48 T.C. 532, 541 (1967); James D. Dunn, 42 T.C. 490, 495 (1964). Therefore, petitioner must show with some exactitude that economic obsolescence is a real threat to the income-producing nature of the property, rather than a lingering possibility, and that the threat existed during the years in issue. At trial, petitioner and respondent each had one expert witness to support their respective contentions concerning useful life. An expert's opinion is entitled to substantial weight only if it is supported by the facts. Ariel Realty Co. v. Commissioner, 115 F. 2d 659 (C.A. 2, 1940), affirming a Memorandum Opinion of this Court. We have carefully considered and weighed all expert testimony with the other evidence of record. Petitioner's expert witness testified that within the last few years the electronics industry of the Palo Alto area has experienced tremendous growth. Such factors as 298 the availability *257 of skilled labor, the prestige of the Palo Alto address, and the proximity to Stanford University, have combined to make petitioner's land of particularly great value to the expanding electronics industry. A consequence has been a spiraling of the value of land suitable for the industry. Petitioner's land is very close to the University, thus increasing not only its present value, but also its future value to the expanding electronics industry. He further testified as to the impact of the electronics industry generally upon the entire Palo Alto area, and specifically upon the Philco Industrial Park. Recently many big name electronics firms have found the area to be ideal for research and development purposes. However, almost all of petitioner's expert testimony dealt with the situation which existed in 1967, five years after the years here involved, and with the foreseeable future from that time forward, not from 1962 and 1963. This 1967 situation was markedly different from that which existed in the years before us. The expert's opinions generally supported petitioner's arguments, but they must be viewed in the light of hindsight, from 1967 back to 1962 and 1963, and in that light *258 are not too persuasive. Respondent's expert witness presented a somewhat different method for determination of useful life. He considered the utility of the building itself, the general area, the transportation facilities, the labor market, and the specific purpose for which the buildings were erected and the use to which they are being put. He concluded that they can continue to be put to their present use, the same one for which they were built, for a period equal to their physical lives, and that as so used will continue to produce income for the owners. Petitioner leases his land and his buildings in order to produce income. His primary interest in the land and buildings is simply to produce as much income as possible. He contends that in order to achieve that goal, he may be forced to raze the buildings before expiration of their physical useful lives in order to construct buildings which will be more attractive to the lessees of some future date. This was highly speculative even at time of trial and was not at all foreseeable or anticipated for the area in 1961 and 1962, when petitioner's buildings were built. The possibilities viewed for the future in 1967 and feared by *259 petitioner were by no means even clearly such in that year and certainly not probabilities then. Whether they will ever develop into probabilities or certainties in later years so as to justify abandonment of petitioner's buildings or reduction of useful life for depreciation purposes would be anybody's guess; we need not decide those questions here. Respondent urges a useful life determined primarily with reference to the period of time over which the buildings can be physically maintained in their present and originally intended use. He urges that the useful lives he has determined for petitioner's buildings are in accordance with Rev. Proc. 62-21, 1962-2 C.B. 418 and that if petitioners are to prevail they must justify shorter lives because of facts or circumstances, known or reasonably anticipated at the end of the year for which depreciation is taken. M. Pauline Casey, supra. We agree with respondent that petitioners have failed to make an adequate showing here as to shorter useful lives for 1962 and 1963. The Commissioner's Regulations (Section 1.167(a)-9) *260 explain that (economic) obsolescence should be taken into account when determining useful life if it will render the asset economically useless to the taxpayer. If the taxpayer is to sustain his burden with regard to economic obsolescence, he must show with reasonable certainty that the assets will become obsolete before the end of their normal lives. Detroit Windsor Ferry Co. v. Woodworth, 115 F. 2d 595 (C.A. 6, 1940), certiorari denied 312 U.S. 692 (1941). Since economic obsolescence is defined in terms of usefulness to the taxpayer, petitioners must establish with reasonable certainty that their buildings will have little or no value at the end of the projected useful life they have employed. This they have failed to do here, establishing only by their expert witness that in 1967 a possibility existed that at some undisclosed future time the buildings might become so obsolete and inadequate for their sites that they would be torn down and replaced by other taller buildings if variances in zoning could then be obtained. In our considered view upon the entire record the evidence fails utterly to justify the shorter useful lives adopted for 1962 and 1963 *261 by petitioners and their expert, and respondent's determinations must be sustained. [4] 299 As in James D. Dunn, supra, the declining values caused by changed economic conditions predicted here, even if such are deemed established, will not support a claim for obsolescence. Here too petitioner has failed to prove that the expected useful lives of his properties were actually threatened by economic obsolescence in 1962 and 1963. See section 1.167(a)-9, Income Tax Regs. In the present case, petitioner has demonstrated merely that there was an unforseen possibility of a change in the economic conditions in the community that might dull the teeth of his income-producing property before old age accomplished that result. A glimmer of this possibility became visible by 1967, at time of trial, but even then it *262 was no more than that; it was not even a spark in the years before us. Respondent, citing Joseph E. Swanson, Trustee, 29 B.T.A. 1123 (1934), affd. per curiam 80 F. 2d 1021 (C.A. 7, 1936), contends that a decrease in the rate of return, in itself, does not establish economic obsolescence. In Swanson we cited U.S. Cartridge Co. v. United States, 284 U.S. 511 (1932), which held that obsolescence may arise from inadequacy or any change apart from physical deterioration which causes the asset to suffer a diminution in value. In the present case, not only did petitioners fail to establish that a multistoried building rather than the present structures will be more suitable in the future, but they failed to show that the present structures would be "inadequate" for the purposes for which they were erected in future years. Respondent's determination of the useful life of the buildings should not be altered unless there was reasonable certainty in 1962 and 1963 that obsolescence would occur so as to shorten useful lives. James D. Dunn, supra. *263 We hold that petitioner has not shown that any reasonable certainty of economic obsolescence was a real factor in determining the useful lives of his buildings in the years before us. "[We] cannot say that the alleged brooding omnipresence of obsolescence impended during the taxable year before us to such an extent as to justify the shortened periods of useful life adopted by petitioner." [5]
The Commissioner acquiesced in M. Pauline Casey, supra, in which we noted that the test of obsolescence assumes that an asset will be disposed of when it can no longer be used profitably by the owner. Although the physical life of an asset, we continued, is important in ascertaining economic life, it cannot be used as the sole criterion in determining useful life when it is shown that the asset will have a shorter economic life than physical life. Here, however, petitioner's evidence has not convinced us that economic factors will shorten the useful life of the buildings as determined by respondent. Therefore, petitioner has not met his burden and proved respondent's determinations of useful life to be erroneous; *264 they are in accord with the guidelines laid down by Rev. Proc. 62-21 and on the record presented should not be disturbed. Decision will be entered under Rule 50. Footnotes
1. The parties have stipulated that petitioners are entitled to deduct for club dues and charges for the years 1962 and 1963 the amounts of $1,964.82 and $1,655.05 rather than $2,404.72 and $2,129.60, the amounts claimed in the tax returns.↩
1. Heating, ventilating, and air conditioning.↩
1. Heating, ventilating, and air conditioning.↩
2. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. ↩
3. Sec. 1.167(a)-1 * * * (b) Useful Life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. * * * Sec. 1.167(a)-9 Obsolescence. The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession of inadequacy brought about by developments in the industry, products, methods, markets, sources of supply and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete. * * *↩
4. Respondent stated on opening statement and contended at trial that his determination was based upon a composite life of 45 years for the buildings and their plumbing, heating, air conditioning and electrical systems. The latter finds support in Rev. Proc. 62-21, 1962-2 C.B. 418↩. Petitioner does not dispute this.
5. Stevens Realty Co., T.C. Memo. 1967-113↩.