Eugene W. Zimmerman and Irene F. Zimmerman, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 9007–73. Filed October 27, 1976.

*Alan J. Davis* and *Dennis L. Cohen,* for the petitioners.
*Lowell F. Raeder,* for the respondent.

Sterrett, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1968 and 1969 in the amounts of $79,556.06 and $72,170.35, respectively. The sole issue for decision is whether petitioners are entitled to depreciation deductions on three motels and an antique car museum in excess of those determined by respondent by reason of claimed economic obsolescence which petitioners assert has rendered their respective useful lives shorter than those determined by respondent.

#### FINDINGS OF FACT

Petitioners Eugene W. Zimmerman and Irene F. Zimmerman, husband and wife, resided in Mechanicsburg, Pa., at the time they filed their petition herein. They filed joint Federal

income tax returns for the calendar years 1968 and 1969. Irene F. Zimmerman is a party to this proceeding solely by reason of having joined in the filing of these returns. The term "petitioner" will hereinafter refer solely to Eugene W. Zimmerman.

Petitioner is the owner of three motels situated in or in the vicinity of Harrisburg, Pa. They are: Holiday East Motor Hotel (hereinafter East); Holiday West Motor Hotel (hereinafter West); and Holiday Inntown Motor Hotel (hereinafter Inntown). Petitioner is also the owner of an antique car museum, Automobilorama, located at and a part of West. Neither petitioner nor his motels are in any way affiliated with the nationwide Holiday Inn chain or any other chain of motels. Billboards advertising all three motels can be seen from the Pennsylvania Turnpike.

West is a 300-unit, ranch style, multilevel motel located at exit 17 of the Pennsylvania Turnpike where that highway intersects U.S. Route 15. The initial construction of West was completed at the end of 1952 and West opened its doors for business at the beginning of 1953. Since that time, its principal source of patrons has been motorists using the Pennsylvania Turnpike[1] or U.S. Route 15. In 1953 both were major arteries, the Pennsylvania Turnpike traversing that State in an east-west direction and U.S. Route 15 being a major thoroughfare for traffic passing through Harrisburg to Baltimore, Washington, and other points south. While this state of affairs lasted, West was a profitable enterprise.

During the 1960's and 70's major highway construction resulted in the opening of new roads in the vicinity of Harrisburg which brought with them a dramatic alteration of the traffic patterns in that area. Although the Pennsylvania Turnpike has retained its status as a major highway, a good deal of east-west traffic uses Interstate 80. Furthermore the opening of U.S. Route 11 and Interstate 83 has enabled traffic coming from the east or northeast of Harrisburg towards Carlisle to bypass Harrisburg without using the Pennsylvania Turnpike. Similarly the development of Interstate 81 has enabled travelers from points north of Harrisburg to bypass the city north thereof rather than utilize U.S. Route 22 which

---

[1] West can be seen from the Pennsylvania Turnpike.

intersects U.S. Route 15 in Harrisburg. These changes, in conjunction with the opening of U.S. Route 40, have rendered U.S. Route 15 a seldom used road apart from local traffic. Due to these changes the location of West, which previously could be characterized as prime, is now very poor.

West's operational results for the years 1961 through 1974 exclusive of the year 1967[2] are set forth below:

RESULTS OF OPERATIONS AT HOLIDAY WEST BEFORE DEPRECIATION AND DEBT SERVICE

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1961 | $322,163.72 | 1969 | $186,085.00 |
| 1962 | 299,115.05 | 1970 | 233,575.00 |
| 1963 | 208,827.93 | 1971 | 58,967.00 |
| 1964 | 249,682.20 | 1972 | 94,812.00 |
| 1965 | 108,681.00 | 1973 | (47,493.00) |
| 1966 | 180,794.00 | 1974 | (105,371.00) |
| 1968 | 202,488.00 | | |

The occupancy statistics for West during the years 1961 through 1975 are shown in table 1.

Automobilorama is a three-story museum building, the first floor of which houses the lobby, restaurant, gameroom, and gift shop of West. The executive offices of West are located on the second floor of the museum. The balance of Automobilorama is devoted to the display and maintenance of antique automobiles.

Petitioner began construction of Automobilorama in 1965 for the purpose of attempting to offset West's failing profits. However, due in part to his inability to secure a liquor license and thereby attract the car rally business, Automobilorama did not make a profit until 1971.

In 1973 the drop in business caused petitioner to close and attempt to sell West. At that time the 3-hole golf course had already been closed 1 year; the pipes required replacing which necessitated breaking up the concrete covering; the boilers, water heaters, and roofs were in need of repair; and parts necessary to repair the pool could not be obtained due to its age. He found two prospective purchasers. The first, a Presbyterian group, contemplated purchasing West for use as a nursing home. The group failed to comsummate the purchase when the roof failed to meet State standards. The

---

[2] No figures appear in the record for the year 1967.

TABLE 1

### Holiday West—Occupancy Statistics

| | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of rooms in hotel | 232 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | | | | |
| Average daily rate per occupied room | 11.66 | 12.19 | 10.70 | 12.23 | 12.33 | 12.99 | 12.36 | 13.69 | 14.11 | 16.81 | 17.51 | Not broken down | | | |
| Average daily rate per guest | 5.98 | 6.46 | 5.55 | 6.38 | 6.51 | 6.60 | 6.76 | 7.63 | 8.04 | 9.28 | 9.25 | | | | |
| Number of available rooms | 83,712 | 91,385 | 99,667 | 100,650 | 100,375 | 100,375 | 103,514 | 102,480 | 102,480 | 98,880 | 100,375 | | | | |
| Number of rooms occupied | 54,309 | 55,180 | 62,615 | 51,683 | 44,947 | 42,465 | 45,919 | 44,868 | 47,396 | 36,572 | 28,125 | | | | |
| Percentage of occupancy | 64.87 | 60.38 | 62.82 | 51.35 | 44.8 | 42.3 | 44.8 | 43.8 | 46.2 | 37.01 | 28.0 | 29.7 (Estimated) | 22.0 | 4.5 | 15.2 |

second, a Lutheran group desirous of converting West into a retirement home, took an option to purchase West for $4,500,000. However, finding that it would be cheaper to erect a new edifice than to buy and renovate West, it also decided to forego the acquisition of West.

Finding himself unable to dispose of West petitioner reopened it on a partial basis to secure what revenues he could and to prevent vandalism. At the present time between 30 and 70 rooms are open daily on a budget rate basis. The revenues from such an operation, however, are currently insufficient to carry the taxes and utility expenses incurred in connection with West and petitioner is still attempting to sell it.

Respondent's expert, John Liadis (hereinafter Liadis), placed a useful life of $33\frac{1}{3}$ years on West. In his opinion West was structurally sound and in need of only cosmetic repairs. He further felt that the presence of banquet and restaurant facilities, a conference room, adequate guest rooms, ample parking, the layout of West, and its location justified his estimate. In arriving at this estimate Liadis took into consideration obsolescence resulting from advances in the motel building industry.

Petitioner accounts for the depreciation on West on a component basis utilizing a useful life of 20 years for the buildings and various useful lives for the components thereof. Respondent determined that a 30-year composite useful life was proper for West. Petitioner accounts for the depreciation on Automobilorama utilizing a composite useful life of 20 years. Respondent determined that a 30-year useful life was appropriate for Automobilorama.

East is situated near exit 19 of the Pennsylvania Turnpike which marks the intersection of that road and Interstate 283. The initial construction of East was completed in 1951 and it opened for business in that year. At that time the exit ramp led directly into Route 230 upon which East fronted thereby providing easy access to the property. However the interchange was reconstructed with the opening of Interstate 283 which was built in 1968 thereby making access to East more difficult.[3]

---

[3] East is visible to eastbound traffic on the Pennsylvania Turnpike but is not visible to southbound traffic on Interstate 283.

The following are the operating results for East during the period 1962 through 1974:

RESULTS OF OPERATIONS AT HOLIDAY EAST BEFORE DEPRECIATION AND DEBT SERVICE

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1962 | $202,205.67 | 1969 | $204,217.00 |
| 1963 | 174,673.65 | 1970 | 185,566.00 |
| 1964 | 193,715.00 | 1971 | 82,572.00 |
| 1965 | 150,688.00 | 1972 | 107,797.00 |
| 1966 | 121,613.00 | 1973 | 14,781.00 |
| 1967 | 139,263.00 | 1974 | 41,131.00 |
| 1968 | 170,250.00 | | |

The occupancy statistics for East during the period 1962 through 1975 are shown in table 2.

By the early 1970's East was in great need of repairs. The electricity had deteriorated to the extent that it required replacement; the ceilings, plumbing, and swimming pool were in need of repair; and new sewage lines, furniture, fixtures, and equipment were required. Petitioner retained Marshall & Stevens, Inc., an engineering firm, and Laventhol & Horwath, a hospitality industry consulting firm, to do a feasibility study. The report of Laventhol & Horwath indicated that without major alterations East could not be operated profitably. Accordingly it was recommended that petitioner modernize the existing rooms and build 72 additional rooms; that he enlarge the dining area to accommodate 200 persons; that he expand the conference facility and build a cocktail lounge adjacent thereto; and that petitioner renovate the swimming pool. Petitioner invested approximately $2 million[4] in new rooms, sewage lines, expanded parking facilities, and a partial modification of the conference facility. However due to a lack of funds other needed renovations were not made.

Respondent's expert placed a useful life of 33⅓ years on East. He found the rooms adequate and the location good. However he did not see East prior to its renovation.

Petitioner accounts for the depreciation of East on a component basis, having assigned a 20-year useful life to the buildings and various lives to the components thereof. Respondent asserted a 30-year composite useful life for East.

[4] The initial cost of East was approximately $1 million.

TABLE 2

HOLIDAY EAST—OCCUPANCY STATISTICS[1]

| | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of rooms in hotel.............. | 130 | 130 | 130 | 130 | 130 | 130 | 128 | 128 | 128 | 128 | | | | |
| Average daily rate per occupied room. | 11.73 | 11.95 | 11.89 | 11.83 | 11.66 | 12.58 | 12.69 | 13.68 | 15.81 | 16.36 | Not broken down | | | |
| Average daily rate per guest............. | 6.64 | 6.67 | 7.01 | 6.79 | 7.01 | 7.57 | 8.03 | 9.42 | 10.06 | 10.37 | | | | |
| Number of available rooms................. | 47,320 | 47,320 | 47,580 | 47,450 | 47,450 | 47,586 | 46,720 | 46,720 | 46,720 | 46,720 | | | | |
| Number of rooms occupied............... | 30,513 | 30,197 | 29,694 | 28,112 | 25,224 | 23,992 | 27,940 | 2,082 | 23,132 | 17,724 | | | | |
| Percentage of occupancy................. | 64.48 | 63.81 | 62.4 | 59.2 | 53.2 | 50.4 | 59.8 | 62.3 | 49.5 | 37.9 | 40.6 (Estimated) | 30.5 | 28.0 | 36.4 |

[1] The Reading Railroad has a contract with East for 10 rooms per night.

Inntown is a highrise motel containing 265 units located at Second and Chestnut Streets in downtown Harrisburg approximately 6 blocks from the Pennsylvania State capital complex. The edifice itself is constructed of terrazzo and concrete and is structurally sound. It possesses a rather attractive exterior and a somewhat dated decor and architectural layout. Inntown does have a cocktail lounge, restaurant, and conference facility on the premises. However, these facilities are not visible except from the motel's interior and there are no public entrances thereto. Furthermore, the cocktail lounge seats only 80 persons and lacks the space needed for sizable entertainment. Also located within Inntown is the Allegheny Airlines ticket office.

In terms of style and amenities Inntown is not comparable to the modern luxury motels such as the Sheraton which are located in the Harrisburg area. These motels possess innovative architectural advancements that became popular in the late 1960's and are characterized by plush decor, athletic, recreational, and entertainment facilities, nightlife, and health clubs. Due to its location and construction, Inntown lacks the potential to duplicate such facilities and advancements.

Inntown was originally conceived as a part of an overall redevelopment program for downtown Harrisburg. This program was to involve the construction of a transportation center, convention center, office facilities, shopping facilities, and parking lots. Subsequent to the commencement of the construction of Inntown, the redevelopment plans were scrapped and no construction took place that enhanced Inntown's business. As a result, the surrounding area is still beset by problems typical of the inner cities and can be characterized as a declining area. Since 1967 the population of downtown Harrisburg has declined and there has been a migration to the suburbs in retailing, office space, conference activity, residential development, and leisure activities. Presently there is little in the way of recreational activity near Inntown and property values have dropped drastically in the downtown area. These conditions, coupled with the advent of the modern luxury motel, have cost Inntown most of its

conference business. Accordingly, it does most of its business on weeknights.

The results of the operation of Inntown for the years 1966 through 1974 are set forth below:

RESULTS OF OPERATIONS AT HOLIDAY INNTOWN BEFORE DEPRECIATION AND DEBT SERVICE

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1966 | $434,565 | 1971 | $638,828 |
| 1967 | 525,303 | 1972 | 654,286 |
| 1968 | 534,067 | 1973 | 450,041 |
| 1969 | 645,547 | 1974 | 370,791 |
| 1970 | 706,175 | | |

The occupancy statistics for Inntown for the years 1965 through 1975 are shown in table 3.

A comparison of the operation of Inntown with similar motels is set forth below.[5]

PER ROOM BASIS

| | Net sales | Gross profit | Operating expenses | House profit |
|---|---|---|---|---|
| Holiday Inntown—1974 | $6,021 | $3,330 | $1,332 | $1,999 |
| Holiday Inntown—1975 | 5,790 | 2,772 | 1,486 | 1,285 |
| Total sales, $1.5–3 mil | 9,295 | 4,162 | 2,039 | 2,286 |
| Avg. rate $18–$24 | 8,510 | 4,122 | 2,010 | 2,419 |
| Center city | 10,145 | 4,838 | 2,676 | 2,268 |
| Northeast | 10,049 | 4,638 | 2,476 | 2,185 |
| Nonchain | 10,850 | 4,668 | 2,488 | 2,321 |
| Built 1960–69 | 8,866 | 4,272 | 2,060 | 2,247 |

Liadis found Inntown to be structurally sound with an appealing style and adequate rooms and facilities. He classified it as a businessman's hotel with a remaining useful life of 40 years. Petitioner's expert placed a 2-to-4-year remaining useful life on Inntown.

Petitioner accounts for the depreciation of Inntown on a composite basis having assigned a 25-year useful life to the building and its components and a 10-year useful life to its elevators. Respondent has asserted a 35-year useful life for the building, its components, and its elevators.

---

[5] Laventhol & Horwath, 43d annual report on hotel and motor hotel operations, U.S. Lodging Industry (1975).

TABLE 3

HOLIDAY INNTOWN—OCCUPANCY STATISTICS

| | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of rooms in hotel.... | 265 | 265 | 265 | 265 | 265 | 265 | 265 | | | | |
| Average daily rate per occupied room............. | 13.41 | 14.23 | 15.15 | 15.86 | 16.74 | 17.81 | 19.32 | | Not broken down | | |
| Average daily rate per guest............... | 9.64 | 10.23 | 9.88 | 11.44 | 11.75 | 12.17 | 13.20 | | | | |
| Number of available rooms . | 68,404 | 96,725 | 96,731 | 96,990 | 96,990 | 96,725 | 96,725 | | | | |
| Number of rooms occupied.. | 35,328 | 56,852 | 58,943 | 60,575 | 63,766 | 65,445 | 58,815 | | | | |
| Percentage of occupancy...... | 51.6 | 58.8 | 60.9 | 62.5 | 59.8 | 67.6 | 60.8 | 64.2 | 57.8 | 53.7 | 51.2 |

OPINION

Section 167(a), I.R.C. 1954,[6] provides for a deduction for a reasonable allowance for the exhaustion, wear, and tear, including a reasonable allowance for obsolescence of property used in a trade or business. Respondent has determined that the deductions for depreciation claimed by petitioner with respect to the buildings at issue are excessive. In his notice of deficiency he has set forth allowable depreciation deductions based upon the following composite useful lives:

| East | 30 years | Inntown | 35 years |
| West | 30 years | Automobilorama | 30 years |

Respondent's determination is presumptively correct and petitioner has the burden of showing that this determination is incorrect. *Welch v. Helvering,* 290 U.S. 111, 115 (1933); Rule 142, Tax Court Rules of Practice and Procedure.

Petitioner contends that the useful lives he employed in computing depreciation deductions for 1968 and 1969 are entirely reasonable and are justified by the facts and circumstances that attended the respective buildings in those years.[7] The precise legal theory upon which petitioner rests his case is somewhat unclear. The thrust of his argument appears to be that although the useful lives as determined by respondent are correct in light of the physical states of the respective buildings, the useful lives thereof should be shortened due to obsolescence.[8] However, both at trial, through the evidence proffered, and on brief, he strongly intimates that respondent underestimated the physical wear

---

[6] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

[7] We note that petitioners alleged in their petition that their use of the component method in computing the depreciation deductions claimed on their returns was proper and that respondent erred in determining a composite useful life for the buildings at issue. However at trial and on brief they made no argument in this regard and we deem them to have conceded this issue. In any event they have failed to sustain their burden of proof with respect thereto.

[8] Petitioner's contention with respect to Automobilorama is somewhat different and will be discussed *infra.*

and tear on these buildings. Respondent throughout this proceeding has been cognizant of the aforenoted intimations and introduced evidence at trial pertaining to the physical condition of the respective buildings. Hence he has not been prejudiced by the manner in which petitioner has advanced his arguments and our decision will rest both on the physical wear and tear and the obsolescence, if any, sustained by the respective buildings.

Useful life is defined in section 1.167(a)–1(b), Income Tax Regs., as "not necessarily the useful life inherent in the asset but * * * the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income." This regulation further provides:

This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. For rules covering agreements with respect to useful life, see section 167(d) and §167(d)–1. * * *

## Section 1.167(a)–9, Income Tax Regs., provides:

The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and

legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete. For rules governing the allowance of a loss when the usefulness of depreciable property is suddenly terminated, see §1.167(a)–8. If the estimated useful life and the depreciation rates have been the subject of a previous agreement, see section 167(d) and §1.167(d)–1.

A determination of useful life, whether grounded in physical deterioration or in obsolescence, is one of fact. *Radio Station WBIR, Inc.,* 31 T. C. 803, 817 (1959). Although the legal standards with respect to depreciation for wear and tear are not susceptible to precise application, they are clear and no controversy with respect thereto exists between the parties. However, the guiding principles regarding obsolescence are not as well defined and the parties are at arm's length as to what conditions will suffice to sustain a deduction for obsolescence. Hence, we think it helpful to review the law as it has developed in this area before proceeding to our discussion of the particular properties involved.

The Federal tax law has long recognized two distinct categories of obsolescence: (1) "Extraordinary" obsolescence or the sudden loss of utility and (2) "normal" obsolescence or the gradual loss of usefulness due to the normal progress of the arts, invention, technological improvements, and legislation. *Coors Porcelain Co.,* 52 T. C. 682, 689 (1969), affd. 429 F.2d 1 (10th Cir. 1970). It is the latter class that is the focus of the instant controversy.

It is clear that normal obsolescence is a factor to be considered in the determination of useful life for purposes of depreciation. *Coors Porcelain Co., supra* at 692. Unfortunately that term is nowhere defined in the Code and both the aforenoted regulation and the cases proceed by example rather than by comprehensive definition. See *Real Estate-Land Title & Trust Co. v. United States,* 309 U. S. 13 (1940). An analysis of the cases, however, reveals that obsolescence is, in the first instance, the antithesis of depreciation for wear and tear, resting ultimately on disuse rather than use. *James D. Dunn,* 42 T. C. 490 (1964). In effect it affords a taxpayer the

opportunity to recover the cost of an asset if he sustains the burden of proving that depreciation deductions for wear and tear will be insufficient to restore to him the basis of the asset because the life thereof has been shortened by reason of its having been rendered inutile for the function it once performed. *Southeastern Building Corp.,* 3 T. C. 381 (1944), affd. 148 F.2d 879 (5th Cir. 1945), cert. denied 326 U. S. 740 (1945).

We agree with respondent that to sustain his burden with respect to a deduction for obsolescence petitioner must show both that the properties are becoming obsolete and that they will be obsolete. Put another way, petitioner must prove what the normal useful lives of the buildings are and that each will become obsolete prior to the expiration thereof. *James D. Dunn, supra* at 494. Furthermore, a reduction in or an absence of profits is not sufficient to sustain a deduction for obsolescence. *Detroit & Windsor Ferry Co. v. Woodworth,* 115 F.2d 795 (6th Cir. 1940). Nor are declining values due to economic conditions. *State Line & Sullivan R. Co. v. Phillips,* 98 F.2d 651 (3d Cir. 1938), cert. denied 305 U. S. 635 (1938). At the very least petitioner must show either a dramatic shift in the state of the motel industry such as to render his motels inutile as motels or a reasonably prospective intended abandonment resulting from external forces to sustain a deduction for obsolescence. *Real Estate-Land Title & Trust Co., supra.*

Turning first to Inntown we hold that respondent's determination must be sustained. Petitioner proffered no evidence to indicate that Inntown had sustained wear and tear in excess of that considered by respondent in making his determination. Hence petitioner to prevail must demonstrate that due to obsolescence the useful life of Inntown is less than the 35-year life placed on that property by respondent. This they have failed to do.

The testimony by and on behalf of petitioner and the documentary evidence relating to Inntown amply demonstrates the decline and fall of downtown Harrisburg and the rise of the suburbs as an economically prosperous area. Further, it shows that Inntown does not possess the innovations in the art and design of the newer luxury motels which have wrested from it many of its patrons including most of its

convention business. While we sympathize with petitioner's plight, he has unfortunately confused obsolescence with competition. *Atlanta Biltmore Hotel Corp. v. Commissioner,* 349 F.2d 677 (5th Cir. 1965). As noted above decreasing profits due to economic conditions, including competition, are not a sufficient basis for an obsolescence deduction.

Furthermore, although changes in the art and style of motels have evolved since the construction of Inntown, they are changes in degree rather than kind. Admittedly the invention of the combustion engine rendered the steam engine obsolete. That however was a change in kind that rendered the steam engine economically useless as an engine. The change in motel architecture is not such a dramatic shift resulting in older motels becoming useless as motels. In particular we find it difficult to believe that a motel such as Inntown, which is but 11 years old, is located but 6 blocks from the Pennsylvania State capital, has shown a profit (prior to depreciation and debt service) from 1965[9] through 1974, and is still open, is or is becoming obsolete.

Turning next to East, we are also of the opinion that petitioner has failed to sustain his burden of proving he is entitled to a deduction for obsolescence. First, as noted above, we do not believe the advancements in motel architecture are such as to warrant a finding of obsolescence. Nor are the declining profits. Secondly, we are not persuaded that the change in the off ramp of exit 19 of the Pennsylvania Turnpike has shortened the useful life of East. Thirdly, petitioner expended considerable sums of money in the 1970's in an effort to renovate East and thereby make it competitive. Such actions clearly belie any intention on his part to discontinue the use of East as a motel. As we said in *James D. Dunn, supra* at 495:

> To permit an allowance for obsolescence while the property is being continuously used for its original purpose, while the petitioner continues to build new facilities and while no intention to discontinue such use appears, is to make an allowance in the face of conditions which are the very opposite of obsolescence.

However, petitioner introduced expert testimony pertaining to the physical condition of East which totally contradicted

---

[9] See *Concord Towers, Inc.,* T.C. Memo, 1974-259.

that of respondent's expert. It was brought out at trial that respondent's expert did not see East prior to renovation and arrived at his estimate by envisioning what East must have looked like in 1968 and 1969. In light of this fact we attribute little weight to his findings as they pertain to East. Based upon the testimony of petitioner's expert, Callnin, as it pertained to the physical condition of East we find a 25-year useful life to be appropriate in computing the depreciation deductions on East for 1968 and 1969.

Turning to West we find that petitioner has met his burden of proving his entitlement to a deduction for obsolescence. In reaching this conclusion we adhere to our aforenoted opinion concerning advances in motel design and believe they are not such as to render West obsolete as a motel. However, the changes in traffic patterns have rendered its location such that West is virtually useless as a motel. Such an external change is a proper factor to consider in the determination of useful life and clearly renders the useful life of West shorter than it would otherwise be. Furthermore, and more importantly, such changes were not only readily foreseeable in 1968 but ultimately led to the closing of West and petitioner's efforts to sell West. Admittedly, West is still open on a partial basis. However, on the facts presented this is not an insurmountable barrier to an obsolescence deduction for the reason that petitioner reopened it to prevent vandalism and to offset as much of the carrying charges as possible. We find it absurd to say that petitioner is foreclosed from an obsolescence deduction merely because he makes a sensible decision to make the best of a bad situation until he is able to dispose of the property.

In this regard the case is distinguishable from *Coors Porcelain* where the taxpayer tried to find an economic use for the allegedly obsolete building and actually used it for purposes other than to maintain its salvage value.

In this connection respondent has advanced the argument that petitioner could find an alternative use for West, thereby extending its useful life. We find no merit in this contention. The useful life of an asset is the period over which it will be useful to a taxpayer in *his* trade or business. *Massey Motors, Inc. v. United States,* 364 U. S. 92 (1960). Petitioner is simply not in any business other than the motel business in which

West would be of any use. We hold that, even accepting the opinion of respondent's expert with respect to the physical condition of West, petitioner is entitled to a deduction for obsolescence with respect thereto and a 20-year useful life is a proper basis upon which to calculate the depreciation deductions thereon.

Finally we turn to Automobilorama. Little or no evidence was offered with respect to this building.[10] It is petitioner's position that Automobilorama is an integral part of West and their respective useful lives will terminate simultaneously without regard to the actual condition of Automobilorama. To be successful, petitioner must demonstrate that the useful life of Automobilorama inextricably is related to that of West so that its usefulness as an antique car museum will terminate when the useful life of West ceases. *Tunnell v. United States,* 512 F.2d 1192 (3d Cir. 1975).

Although the question is not free from doubt in light of the original purpose for which Automobilorama was built, we think petitioner has failed to make such a showing. The hard fact is that Automobilorama is a car museum and can be operated as such subsequent to the closing of West. Moreover, Automobilorama remained open during the period in which West was closed and has remained open notwithstanding that West is only, in part, now open for business. For this reason we find *Atlanta Biltmore Hotel Corp., supra,* to be distinguishable from the instant case. In light of the absence of proof in respect of the physical condition of Automobilorama respondent's determination with respect thereto is hereby sustained.

*Decision will be entered under Rule 155.*

---

[10] Petitioner has demonstrated the inability of Automobilorama to operate in the black. However, as noted above, this, in and of itself, is insufficient to sustain a deduction for obsolescence. No evidence was introduced relating to the physical condition of the building.