G. JAY DAVIS AND FREDDIE DAVIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Davis v. Commissioner
Docket No. 11432-82.
United States Tax Court
T.C. Memo 1984-240; 1984 Tax Ct. Memo LEXIS 427; 48 T.C.M. (CCH) 16; T.C.M. (RIA) 84240; May 7, 1984. William L. O'Callaghan, Jr.,William Jarell Jones and Richard L. Stumm, for the petitioners. Larry D. Anderson, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in the amount of $1,156 in petitioners' Federal income tax for taxable year 1977. The only issues for decision are the useful lives for depreciation purposes of various components of an apartment complex. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. Petitioners are married and filed a joint *428 Federal income tax return for taxable year 1977 with the Internal Revenue Service in Atlanta, Georgia. The petitioners were legal residents of Thomaston, Georgia, when they filed their petition. Petitioners G. Jay Davis and Freddie Davis were employed as a dentist and bookkeeper, respectively, during taxable year 1977. Northmoor Associates (hereafter referred to as "the partnership") is a Georgia limited partnership. First Equities Corporation is one of its general partners. Limited partnership interests were offered through a private placement memorandum dated February 28, 1977, which specifically informed prospective investors that the partnership's projected investment yields were partially premised upon "plans to take certain income tax deductions the allowance of which, if the partnership were audited by the Internal Revenue Service, is uncertain * * *." On March 1, 1977, petitioner G. Jay Davis purchased a 2.8 percent [1] limited partnership interest for $12,857. On March 1, 1977, the partnership purchased an apartment complex *429 (sometimes hereafter referred to as "the complex") in suburban Atlanta from a New York savings bank which had acquired the complex upon foreclosure of the previous owner. The purchase terms were as follows: the partnership made a $28,000 downpayment and executed a 25-year nonrecourse note in the amount of $2,073,561.81 which provided for both principal and interest payments during its term although principal payments were specifically conditioned on the presence of a positive cash flow from the partnership's ownership of the complex; the savings bank also lent the partnership $150,000 on a nonrecourse basis at below market rates; and finally, the New York lender also agreed to pay for $170,000 of repairs to the complex. The complex consisted of 176 apartment units located in 29 two-story buildings; two swimming pools, a laundry facility; a rental office and a large clubhouse. The rental units were comprised of the following types of apartments: Type
No. of Units
1 bedroom flat
8
2 bedroom townhouse, 1 bath
47
2 bedroom townhouse, 1 1/2 bath
63
2 bedroom townhouse, 2 bath
21
3 bedroom townhouse, 1 bath
7
3 bedroom townhouse, 1 1/2 bath
30
176
*430 The apartment complex was built in 1949. The living units and office building have poured concrete floors and reinforced concrete foundations. Their walls are constructed of hollow clay tiles with a brick veneer overface. There are no observable cracks or signs of structural failure in the outer walls or foundations. Hollow clay tiles and poured concrete floors are no longer commonly used in these types of structures; modern two-story apartment construction is wood frame with brick veneer. Reinforced concrete foundations can last up to 100 years. The roofs of these buildings are flat and made of built-up tar and gravel over a poured reinforced concrete deck. In the mid 1970's, a frame face with an asphalt shingle exterior was added to these structures. Most of the complex's interior and exterior doors are prehung hollow core metal doors. The windows are single pane, metal casement sash. Most of the complex's plumbing for its water supply and waste disposal systems is made of copper or galvanized steel and cast iron, respectively. These systems are embedded in the complex's walls and floors and will generally last as long as the structures containing them. Much of the *431 complex's electrical wiring (exclusive of site utilities) is 12 gauge and housed in galvanized conduit. Barring a massive short or immersion in water, the electrical system will last a long time. There are no significant routine maintenance duties associated with the complex's structural shell, plumbing, site utilities, grading, doors, windows or electrical systems which are necessary for these components to survive their normal useful lives. The apartment complex is located in the northeast quadrant of Piedmont Road and Lindbergh Drive in northeast Atlanta, which is an excellent location from an access and proximity standpoint. Fashionable residential and recreational areas and shopping centers are within two miles of the complex while Atlanta's central business district is less than five miles away. Existing roads provide good access to downtown and other areas. At the time of the partnership's acquisition of the complex, vehicular traffic in the complex's general neighborhood was increasing due to an upgrading of the area's major thoroughfares. In December 1984, the Lindbergh station of the northeastern line of Atlanta's light rail mass transit system, Metropolitan Atlanta *432 Rapid Transit Authority (MARTA), is also scheduled to open within 200 yards of the western edge of the complex. The demand for housing along the corridor bordering this MARTA route is expected to increase through the turn of the century. The complex is bordered by several lower rent apartment complexes and some commercial development. At the time of the partnership's acquisition of the complex, some of its components were in a mild state of disrepair due to the prior owners' failure to perform adequate routine maintenance. The complex had, however, undergone major renovation in 1976 and 1977 which substantially increased its remaining economic life in many respects. Subsequent to the partnership's purchase of the complex, the partnership commissioned a marketability and feasibility analysis concerning the conversion of the complex into condominiums. The study, which was completed in October 1980 by Summerville-Love, Inc., was positive and proposed conversion in late 1981. The partnership sold the complex in 1981. On its return of income for taxable year 1977, the partnership elected to utilize the component method of depreciation; hence, it made various allocations of *433 the complex's purchase price to its depreciable components. The parties agree that these allocations are appropriate. Joseph Harman of First Equities Corporation prepared the partnership's depreciation schedule for the complex. Given the partnership's selection of various useful lives for these depreciable components (as set forth below) and their respective bases, the partnership claimed $264,540 of depreciation deductions and reported a $488,708 loss resulting from its operation of the complex on its return of income for taxable year 1977. Petitioners' distributive share of these reported losses was $13,684 and this loss was used by them in computing their taxable income for taxable year 1977. The Commissioner determined that the useful lives of the complex's depreciable components were greater than those reported by the partnership for tax purposes as follows: Component
Partnership
Commissioner
Foundation & Masonry
23
30
Rough Carpentry
23
30
Grading
23
30
Site Utilities
10
20
Finished Carpentry
10
20
Windows & Exterior Doors
10
20
Plumbing
8
20
Wiring
8
20
Insulation and Glass
8
20
Paving and Roofs
6
12
Swimming Pool
6
12
Sheetrock, Doors, Lath
Plaster and Plastics
6
12
Heating & Air Conditioning
6
12
Toilet Accessories
2
20
Wallpaper
2
20
Painting and Decorating
2
20
Tile Finish
2
20
Striping
2
20
*434 Utilizing the Commissioner's useful lives for the complex's depreciable components, petitioners' distributive share of the partnership's losses for the taxable year 1977 was $10,732. This $2,952 reduction in petitioners' distributive share of the partnership losses resulted in a deficiency for taxable year 1977 in the amount of $1,156.
OPINION The only issues for decision are the useful lives for depreciation purposes of various components of an apartment complex. Section 167(a)(1) [2] allows as a deduction "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) * * * of property used in the trade or business * * *." Petitioners contend that the useful lives claimed by the partnership provide reasonable allowances for depreciation due to the following factors: (1) the 28-year-old complex is functionally obsolete due to design and aesthetic considerations pertinent to Atlanta's rental housing market; (2) the complex's neighborhood is becoming increasingly commercial and less suitable for rental housing especially with the expected advent of the adjacent Lindbergh station of Atlanta's light rail mass transit system; and (3) the *435 complex's poor condition stemming from the former owners' failure to perform adequate maintenance. Respondent contends that the Commissioner's determinations of the components' useful lives provide the requisite reasonable allowances for depreciation and accurately reflect the time period over which these assets would be useful to the partnership's trade or business. Determination of the complex's components' useful lives and the reasonableness of petitioners' depreciation deductions are questions of fact. Matson Navigation Co. v. Commissioner,67 T.C. 938, 944 (1977); Casey v. Commissioner,38 T.C. 357, 381 (1962). Generally, the Commissioner's determinations of the amounts of depreciation allowable for a year in issue are presumptively correct and petitioners bear the burden of proving otherwise. Bell Electric Co. v. Commissioner,45 T.C. 158, 167 (1965); Dunn v. Commissioner,42 T.C. 490, 494 (1964); Rule 142(a). The parties agree that section *436 1.167(a)-1(b), Income Tax Regs., contains some of the relevant considerations in determining an asset's useful life wherein it provides: (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements * * *.
In support of petitioners' contentions that the components' useful lives are less than those determined by the Commissioner, they assert that the 28-year-old *437 facility is functionally obsolete due to design and aethestic considerations pertinent to Atlanta's rental housing market. They argue that the complex's apartment units have too few bathrooms and also lack energy efficient windows and adequate parking. Further, they claim that there are inadequate washer/dryer connections and the units' limited electrical capacities preclude the utilization of some modern appliances. Finally, they contend that the complex's metal doors are energy inefficient and of unsightly industrial design. Petitioners contend that the combination of "these features will make [the complex] much less competitive as time goes on" in Atlanta's cosmopolitan rental housing market. Respondent asserts that a mere reduction in profits due to increased competition is insufficient to sustain shorter useful lives on the basis of alleged obsolescence. Section 1.167(a)-9, Income Tax Regs., which addresses the issue of obsolescence, provides: The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an *438 asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete at some later date. * * * "Normal" obsolescence or the gradual loss of usefulness due to the normal progress of the arts, invention, or technological improvements is clearly a factor to be considered in the determination of useful life for purposes of depreciation. Zimmerman v. Commissioner,67 T.C. 94, 106 (1976); *439 Coors Porcelain Co. v. Commissioner,52 T.C. 682, 692 (1969), affd. 429 F.2d 1 (10th Cir. 1970). It follows that the evolution of consumer demand for higher quality rental housing, i.e., energy efficient units with multiple bathrooms and adequate parking and utility service, could prejudice units lacking such amenities and even render them obsolete in a particular rental housing market. The requisite showing to sustain shorter useful lives based upon a taxpayer's claim of obsolescence, however, is great. In Zimmerman v. Commissioner,supra at 107, which dealt with a taxpayer's claim that his motel buildings had a shorter useful life due to obsolescence than their physical state reflected, we held that: petitioner must show both that the properties are becoming obsolete and that they will be obsolete. Put another way, petitioner must prove what the normal useful lives of the buildings are and that each will become obsolete prior to the expiration thereof. James D. Dunn,supra at 494. Furthermore, a reduction in or an absence of profits is not sufficient to sustain a deduction for obsolescence. Detroit & Windsor Ferry Co. v. Woodworth,115 F.2d 795 (6th Cir. 1940). *440 Nor are declining values due to economic conditions. State Line & Sullivan R. Co. v. Phillips,98 F.2d 651 (3d Cir. 1938), cert. denied 305 U.S. 635 (1938). At the very least petitioner must show either a dramatic shift in the state of the motel industry such as to render his motels inutile as motels or a reasonably prospective intended abandonment resulting from external forces to sustain a deduction for obsolescence. Real Estate-Land Title & Trust Co.,supra.
In the instant case, petitioners did not follow our guidelines enunciated in Zimmerman and prove what the normal useful lives of the complex's components were and that these assets would become obsolete and completely useless in their trade or business prior to the expiration of their normal useful lives. Instead, petitioners sought to prove that the presence of certain "features will make [the complex] much less competitive as time goes on" despite our holding in Zimmerman that a mere reduction in profits, which would result from the alleged less competitive position of the complex, is itself insufficient to sustain one's burden of proof with respect to shortened useful lives *441 as a result of alleged obsolescence. Accordingly, petitioners have failed to carry their burden of proving that the useful lives selected by the partnership would provide reasonable allowances for depreciation as a result of their alleged obsolescence. Petitioners' second basis for contending that the complex's components' useful lives are shorter than those determined by the Commissioner is the transformation of the complex's neighborhood. Petitioners assert that the neighborhood is becoming increasingly commercial and less suitable for rental housing especially with the expected advent of the Lindbergh station of Atlanta's light rail mass transit system (MARTA). By the year 2000, petitioners claim that rising land values accompanying the transformation of the complex's neighborhood will result in the improvements no longer having any value due to functional and economic obsolescence and the complex's value will lie in its real property. In support of their position, petitioners presented the testimony of Dr. Love, an individual who had been chosen by the Atlanta Regional Commission in 1972 to analyze 27 of the proposed MARTA stations and the expected land use changes that the *442 stations would precipitate around them. One of the stations analyzed by Dr. Love was the Lindbergh station, which is 200 yards from the western boundary of the complex.Dr. Love concluded that the complex might be razed between the years 1990 and 2000 for higher use facilities. Petitioners also presented the testimony of Joseph Harman, who was employed by First Equities Corporation, one of the partnership's general partners. After studying the effects of rapid rail systems upon land values and use in Toronto and Montreal, Mr. Harman concluded that the complex's improvements would not have any value after 10 years and that the complex's entire value would lie in its real property at that time. Respondent contends that petitioners' economic projections for future land uses in the complex's neighborhood are too speculative and that the study compiled by Dr. Love for the Atlanta Regional Commission is not supportive of his testimony. After a thorough review of the Lingbergh MARTA station impact study prepared by Dr. Love for the Atlanta Regional Commission, we do not find it entirely supportive of Dr. Love's testimony that the immediate complex would be razed between the years *443 1990 and 2000. Although this study concluded that some apartment complexes in the general area could be demolished for higher uses, the general demand for housing in the corridor bordering the northeastern MARTA line is also expected to increase in the future. Thus, the increased demand will provide economic incentives for preserving existing housing in the general area and the complex's location would add to its attractiveness. Further, in a subsequent study completed by Dr. Love for the partnership in 1980, which analyzed the marketability and feasibility of converting the complex's apartments into condominiums, he concluded that the conversion outlook was positive and proposed conversion in 1981.It seems highly unusual that an apartment complex that is to be razed as early as 1990 would be converted into condominiums in 1981. We conclude, therefore, that Dr. Love's 1980 condominium study supports respondent's position that the complex will still be utilized for housing beyond the year 2000. Finally, Mr. Harman's general reflections about the changes the Lindbergh MARTA station would bring to the neighborhood, based upon his experience with cities outside the United States, *444 was unconvincing especially given the peculiar nature of each city's own development patterns which result from the interaction of numerous variables. Therefore, we reject petitioners' claims that the complex's changing neighborhood will render its improvements valueless by the year 2000. Petitioners' final basis for contending that the complex's components' useful lives are shorter than those determined by the Commissioner is the prior owners' failure to perform adequate maintenance. Petitioners assert that the complex was in a state of disrepair when it was acquired by the partnership and that the lack of adequate maintenance has significantly shortened the complex's components' useful lives. Respondent generally contends that the Commissioner's determinations of the complex's components' useful lives produce reasonable allowances for depreciation given their state at the time of acquisition by the partnership. For discussion purposes, we will combine our analysis of how the alleged lack of maintenance may have shortened a component's useful life with our determination of what its remaining useful life is. The first category of complex components includes its foundation *445 and masonry, rough carpentry and grading. The Commissioner and petitioners assert these components have useful lives of 30 and 23 years, respectively. These components, however, do not require significant amounts of regular maintenance to survive their normal useful lives; therefore, any failure of the prior owners to perform maintenance would not substantially alter their remaining useful lives upon acquisition by the partnership. The complex's foundations and masonry are still in excellent condition and their structural integrity exceeds that of many new apartment complexes. Petitioners failed to present sufficient direct evidence concerning these components' physical characteristics which would establish that their useful lives are 23 years instead of the Commissioner's determinations of 30 years. We have previously rejected petitioners' general allegations of these assets' functional obsolescence due to the absence of proof of their normal useful lives and their ultimate lack of any utility (as opposed to mere decreased utility) prior to the expiration of their normal useful lives. Zimmerman v. Commissioner,67 T.C. 94, 107 (1976). Accordingly, the Commissioner's *446 determinations of these components' useful lives are sustained. Rule 142(a). The second category of complex components includes its site utilities, finished carpentry, windows and exterior doors. The Commissioner and the petitioners assert that these components have useful lives of 20 and 10 years, respectively. Petitioners contend that the useful life of the complex's finished carpentry was shortened by the prior owners' lack of maintenance. They also assert that the complex's windows and exterior doors have lessened useful lives as a result of functional obsolescence stemming from the lack of energy efficient characteristics. Finally, petitioners claim that the complex's site utilities are also obsolete because the complex's alleged limited electrical capacities preclude the utilization of some modern applicances.Respondent contends the Commissioner's determinations of these assets' useful lives provide reasonable allowances for depreciation given their state at the time of the partnershp's acquisition of the complex. The site utilities, windows and exterior doors do not require significant amounts of regular maintenance to survive their normal useful lives; therefore, *447 any failure of the prior owners to perform maintenance would not substantially alter their remaining useful lives upon acquisition by the partnership. Petitioners' claim that the site utilities' useful life is 10 years is unconvincing especially given that Construction Dynamics, Inc., and Land Development Analysts, Inc., who inspected the complex for the partnership, determined their useful life to be 23 and 22 years, respectively. Further, we must also reject petitioners' general allegations of the functional obsolescence of the windows, doors and site utilities as they have not proven what their normal useful lives are and that such assets will be devoid of utility (as opposed to mere decreased utility) prior to the expiration of such normal useful lives. Zimmerman,supra at 107. The remaining evidence presented by petitioners concerning these components was generally unconvincing and, in total, insufficient to carry petitioners' burden of proof. Accordingly, the Commissioner's determinations with respect to the useful lives of the site utilities, doors and windows are sustained. Rule 142(a). As to the finished carpentry, some maintenance was deferred on *448 this asset by the prior owners and this adversely affected its useful life; hence, a 15-year useful life is appropriate. The next category of components includes the plumbing, wiring, insulation and glass. The Commissioner and the petitioners determined their useful lives to be 20 and eight years, respectively. Petitioners contend that the partnership's selection of eight-year useful lives for these components provides reasonable allowances for depreciation for the following reasons: the electrical system is obsolete due to its limited capacity which precludes utilization of some modern appliances; some of the conduit housing the wiring is external and "is unsightly, inhibits rent increases and shows poorly"; the plumbing system is obsolete due to the lack of "cut-off" points to each individual unit; placement of the plumbing in the complex's walls and floors inhibits repairs; the glass is subject to breakage; and the complex's single-pane windows and insulation are obsolete because they are not energy efficient. Respondent again asserts that the Commissioner's determinations of the useful lives of these components provide reasonable allowances for depreciation given their condition *449 at the time of the complex's acquisition by the partnership. We do not find the evidence presented by petitioners in support of their general allegations that these components' useful lives were shortened by the prior owners' alleged lack of maintenance to be convincing. Most of the complex's plumbing for its water supply and waste disposal systems is made of copper or galvanized steel and cast iron, respectively, and does not require regular maintenance in order to survive their normal useful lives. These systems are embedded in the complex's floors and walls and will generally last as long as the structures that contain them. Much of the complex's electrical wiring is 12 gauge and is housed in galvanized conduit. Barring a massive short or immersion in water, the electrical system will last an extremely long time and does not require routine maintenance. The complex's glass is generally single pane and also does not require routine maintenance to survive its normal useful life. The remaining evidence presented by petitioners concerning these components in support of their contentions that they have eight-year useful lives was generally unconvincing and, in total, insufficient *450 to carry petitioners' burden of proof. Finally, petitioners have failed to prove that any of these components have shortened useful lives as a result of obsolescence as they have not proven both their normal useful lives and their ultimate lack of any utility (as opposed to mere decreased utility) prior to the expiration of such lives as a result of such alleged obsolescence. Zimmerman v. Commissioner,supra at 107. Accordingly, the Commissioner's determinations with respect to these components are sustained. Rule 142(a). The next category of components includes the paving, roofs, swimming pool, sheetrock, interior doors, lath, plaster, plastics and heating and air conditioning fixtures. The Commissioner and the petitioners assert that the useful lives of such components are 12 and six years, respectively. Respondent has since conceded that the swimming pool's useful life is eight years. Petitioners presented the testimony of two witnesses with respect to these components: Joseph Harman, who is employed by First Equities Corporation, one of the partnership's general partners, and Dr. Love, who prepared the MARTA impact studies and is also a qualified real *451 estate appraiser. Dr. Love inspected the complex on September 18, 1980, when preparing his analysis of the complex's components' useful lives as of March 1977. Although Mr. Harman actually saw the complex in March 1977, his testimony was cursory and incomplete and given that he actually prepared the partnership's depreciation schedule for the complex and he and his employer have a vested interest in preserving its integrity, we attribute little weight to his testimony. Further, Dr. Love's analysis of the components' useful lives was also unconvincing since three and one-half years elapsed between his examination of the complex and the partnership's acquisition of it. Zimmerman v. Commissioner,supra at 109. Although the testimony of respondent's witness, Robert Butler, an Internal Revenue Service real estate appraiser who had inspected the complex in March 1983, was even less convincing and at times even erroneous with respect to these components, after a thorough review of all of the evidence presented, we hold that petitioners failed to carry their burden of proof. Rule 142(a). Accordingly, the Commissioner's determinations of these components' useful lives *452 are sustained except for the swimming pool whose useful life is determined to be eight years. The final category of components includes toilet accessories (towel bars, paper holders, etc.), wallpaper, painting and decorating, tile finish, and parking lot striping. The Commissioner and the petitioners contend that these components' useful lives are 20 and two years, respectively. Respondent's evidence supporting the Commissioner's determinations of 20-year useful lives for these components was cursory and incomplete. Given that the complex provides rental housing, we accept petitioners' claims that these components are required to absorb a great deal of wear and tear. Petitioners, however, failed to present sufficient credible evidence to support their two-year useful life claims. After a thorough review of the entire record, we hold that the useful lives of these components are five years. Decision will be entered under Rule 155.
Footnotes
1. Petitioner G. Jay Davis owned 2.8 percent of the partnership capital and was entitled to 2.8 percent of any partnership profits or losses.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, and all rule references are to this Court's Rules of Practice and Procedure.↩